KING, C.J.,
 

 for the Court.
 

 ¶ 1. On August 12, 2004, the estate of Bobby Martin filed a wrongful-death lawsuit in the Circuit Court of Lawrence County against Monticello Community Care Center (Monticello) and Comm-Care Mississippi (Comm-Care). Monticello and Comm-Care filed a motion to dismiss or, in the alternative, to compel arbitration. The trial court denied the motion. Aggrieved, Monticello and Comm-Care appeal, raising one issue: whether the trial court erred by denying the motion to compel arbitration. We find no error and, therefore, affirm the trial court’s judgment.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Bobby Martin, the deceased, once lived with his sister Janet Peyton. On November 1, 1996, Martin executed a “General Power of Attorney,” which gave Peyton the authority to act on his behalf regarding his financial and business affairs. After a while, Martin lost the ability to walk, and Peyton could no longer take care of him. Therefore, the family decided to send Martin to a nursing home.
 

 ¶ 3. In December 1997, Martin was admitted to the Lawrence County Nursing Center (LCNC). On December 30, 1997, Juanita Brown, who is also Martin’s sister, signed Martin’s admission agreement for Medicare patients and an admission agreement for Medicaid patients. These admission agreements did not contain an arbitration provision. On the same day, Martin executed a “Durable Power of Attorney for Health Care.” This document appointed Peyton as Martin’s attorney-in-fact and gave Peyton the authority to make healthcare decisions for Martin in the event that he was unable to give his informed consent. Brown was named as an alternate to be used in the event that Peyton was unavailable or unable to act as Martin’s attorney-in-fact.
 

 ¶ 4. In November 2000, Monticello took over the operation of LCNC. As a result, Monticello revised the admission agreement and presented it to the residents and/or their responsible parties for execution. In her deposition, Jalove Calhoun, who was the Patient Activity Director for LCNC, testified that the resident/responsible party did not have to sign the new admission agreement if that person was already a resident of the facility. Brown visited Martin at the nursing home more frequently than Peyton, and Brown testified that LCNC personnel would just hand her documents to sign for Martin. On February 21, 2001, Brown signed the revised admission agreement. This 2001 admission agreement contained an arbitration provision.
 

 ¶ 5. In June 2002, Martin was transferred from LCNC to a hospital, where he later died. On August 12, 2004, Peyton, individually and as the personal representative of Martin’s estate, filed a wrongful-death lawsuit against Monticello and Comm-Care, alleging the following: negligence, medical malpractice, malice or gross
 
 *176
 
 negligence, fraud, breach of fiduciary duty, and wrongful death. Thereafter, Monticello and Comm-Care filed a motion to dismiss or, in the alternative, to compel arbitration based on the arbitration provision contained in the 2001 admission agreement.
 

 ¶ 6. The first hearing on the motion came before Judge R.I. Pritchard III. On May 4, 2005, Judge Pritchard ordered the parties to conduct discovery regarding the enforceability of the arbitration provision. The parties conducted discovery over the next several months and filed briefs in support of their positions regarding the motion to compel arbitration. On January 26, 2006, the case was transferred to Judge Michael Eubanks.
 

 ¶ 7. A second hearing on the motion was held before Judge Eubanks. On May 8, 2006, Judge Eubanks found that: (1) Pey-ton did not delegate any authority to Brown to execute the admission agreement; (2) Brown signed the admission agreement when Martin was not in the room; and (3) Martin was not capable of making a decision to waive arbitration. Based on the foregoing, Judge Eubanks held that: (1) under
 
 East Ford, Inc. v. Taylor,
 
 826 So.2d 709 (Miss.2002), there was no valid arbitration agreement executed because Brown lacked the authority to bind Martin; (2) Brown also lacked the authority to bind Martin under the Uniform Healthcare Decision Act because she was not his parent, legal guardian, or attorney in fact; and (3) Peyton did not sign the 2001 admission agreement. Accordingly, Judge Eubanks denied the motion to compel arbitration.
 

 ¶ 8. Thereafter, Judge Eubanks retired, and Judge Prentiss Harrell succeeded him in 2007. On May 18, 2007, Monticello and Comm-Care filed a “reurged” motion to compel arbitration. In the motion, they argued that there was intervening case law, which declared that a family member could bind a resident to arbitration. A hearing was held on the motion, and, on November 19, 2007, Judge Harrell denied the motion.
 

 ¶ 9. Aggrieved, Monticello and Comm-Care timely filed this appeal.
 

 ANALYSIS
 

 I. Motion to Compel Arbitration
 

 ¶ 10. Monticello and Comm-Care argue that the trial court erred by denying them motion to dismiss or, in the alternative, to compel arbitration. This Court reviews a trial court’s denial of a motion to compel arbitration under a de novo standard of review.
 
 Magnolia Healthcare, Inc. v. Barnes ex rel. Grigsby,
 
 994 So.2d 159, 161(¶ 5) (Miss.2008) (citing
 
 Covenant Health Rehab of Picayune, L.P. v. Brown,
 
 949 So.2d 732, 736(¶ 8) (Miss.2007)).
 

 ¶ 11. A two-pronged inquiry is used in determining the validity of a motion to compel arbitration.
 
 Forest Hill Nursing Ctr., Inc. v. McFarlan,
 
 995 So.2d 775, 779(¶ 5) (Miss.Ct.App.2008). First, the Court must determine whether the parties agreed to arbitration.
 
 Id.
 
 Second, the Court must determine whether there are any legal constraints external to the arbitration agreement that would invalidate the arbitration agreement.
 
 Id.
 

 ¶ 12. The first prong of this analysis has two subparts: “(1) whether there is a valid arbitration agreement and (2) whether the parties’ dispute is within the scope of the arbitration agreement.”
 
 Id.
 
 (citing
 
 East Ford, Inc.,
 
 826 So.2d at 713(¶ 9)). On appeal, Monticello and Comm-Care argue that the arbitration agreement is valid because Brown had authority to bind Martin to the arbitration agreement based on actual authority, ap
 
 *177
 
 parent authority, as a third-party beneficiary, and as a healthcare surrogate.
 

 A. Agency Principles
 

 ¶ 13. Monticello and Comm-Care argue that Peyton delegated her authority to Brown via Martin’s “General Power of Attorney” and his “Durable Power of Attorney for Healthcare,” thus, giving Brown actual authority to bind Martin to the arbitration agreement. Monticello and Comm-Care also contend that Brown possessed apparent authority to act on Martin’s behalf because neither Martin nor Peyton stopped Brown from signing documents for Martin.
 

 1. General Power of Attorney
 

 ¶ 14. Martin executed a “General Power of Attorney,” appointing Peyton as his attorney-in-fact. “Generally speaking, our law regards as valid and enforceable as a power of attorney any written instrument signed by the principal and ‘expressing plainly the authority conferred.’ ”
 
 Miss. Care Ctr. of Greenville, LLC v. Hi-nyub,
 
 975 So.2d 211, 216(¶ 12) (Miss.2008) (quoting
 
 Kountouris v. Varvaris,
 
 476 So.2d 599, 603 (Miss.1985));
 
 see
 
 Miss.Code Ann. § 87-3-7 (Rev.1999). The “General Power of Attorney” gave Peyton the authority to act on Martin’s behalf concerning his financial and business affairs. The document contained a provision which states that:
 

 I hereby ratify all of my [sic] said attorney shall lawfully do or cause to be done by virtue of this power; with full and unqualified authority to delegate any or all of the foregoing powers to any person whom my attorney in fact shall select.
 

 Based on this provision, Monticello and Comm-Care argue that Peyton delegated her authority to act on Martin’s behalf to Brown. In support of this contention, Monticello and Comm-Care simply argue that Brown had actual authority because Peyton did not object to Brown signing documents as Martin’s responsible party.
 

 ¶ 15. In essence, Monticello argues that a second power of attorney was created, appointing Brown as Martin’s attorney-in-fact. An express agency is created when the principal authorizes someone to act on their behalf.
 
 McFarlan,
 
 995 So.2d at 781(¶ 13) (quoting
 
 McFarland v. Entergy Miss., Inc.,
 
 919 So.2d 894, 902(¶ 25) (Miss.2005)). Section 87-3-7 provides, in pertinent part, that there is no special form required for a power of attorney. However, the power of attorney must be a writing that “(a) authorizes an attorney-in-fact or other agent to do, execute or perform any act that the principal might or could do, or (b) evidences the principal’s intent to give the attorney-in-fact or agent full power to handle the principal’s affairs....”
 
 Id.
 
 “The burden of proving an agency relationship rests squarely upon the party asserting it.”
 
 McFarlan,
 
 995 So.2d at 781(¶ 13) (quoting
 
 Highlands Ins. Co. v. McLaughlin,
 
 387 So.2d 118, 120 (Miss.1980)). It is clear that Martin executed a power of attorney that expressly authorized Peyton to act on his behalf; thus, Peyton was Martin’s express agent. There is not, however, any evidence that Peyton or Martin expressly authorized Brown to assume the role of Martin’s attorney-in-fact. There is no writing to that effect. We are not convinced that Peyton’s alleged failure to object to Brown’s actions is evidence of an express authorization. Thus, we find that this argument is without merit.
 

 2. Durable Power of Attorney for Healthcare
 

 ¶ 16. The “Durable Power of Attorney for Healthcare” gave Peyton the authority to make healthcare decisions for
 
 *178
 
 Martin in the event that he was unable to give his informed consent. The document simply named Brown as an alternate attorney-in-fact to be used in the event that Peyton was unavailable or unable to act as Martin’s attorney-in-fact. Mississippi Code Annotated section 41 — 41—205(5)—(6) (Rev.2005) provides that the authority under the power of attorney for healthcare does not become effective until it is shown that the principal lacked capacity, and this determination must be made by the primary physician.
 

 ¶ 17. Neither party has submitted a statement from Martin’s primary physician, stating that Martin lacked capacity. Thus, Martin’s power of attorney for healthcare was never effectuated. Based on the foregoing, Monticello and Comm-Care’s argument that Brown had actual authority to act under the “Durable Power of Attorney for Healthcare” must fail.
 

 3. Apparent Authority
 

 ¶ 18. Monticello and Comm-Care argue that Brown had apparent authority to bind Martin to the arbitration agreement because: (1) both Peyton and Martin were aware that Brown was signing paperwork on Martin’s behalf, and (2) LCNC reasonably relied on Brown’s actions to its detriment.
 

 ¶ 19. To prove that an implied agency existed, the evidence must show that the principal expressly gave the alleged agent the authority to perform acts on his behalf, which would reasonably lead a third party to believe that an agency relationship existed.
 
 McFarlan,
 
 995 So.2d at 781 (¶ 14) (citing
 
 Capital Assocs., Inc. v. Sally Southland, Inc.,
 
 529 So.2d 640, 644 (Miss.1988)). The implied agency relationship can be proven by “facts and circumstances of the particular case, including words and conduct of the parties.”
 
 Id.
 
 (quoting 3 Am.Jur.2d Agency § 16 (2004)).
 

 ¶ 20. The evidence shows that LCNC had a copy of Martin’s power of attorney. LCNC knew who possessed the authority to act on Martin’s behalf, and that person was Peyton. Therefore, we cannot say that LCNC relied on Brown’s actions to its detriment. There is no evidence in the record to suggest that LCNC attempted to contact Peyton to sign the documents or that Peyton expressly gave Brown permission to sign the documents. The record simply shows that Brown visited Martin at the nursing home more frequently than Peyton. Brown stated that LCNC would just hand her documents to sign. Brown did sign as Martin’s responsible party. There is, however, no evidence that Martin, as the principal, acquiesced in Brown’s actions. Brown’s actions alone are insufficient to establish that an implied agency relationship existed.
 
 See id.
 
 Based on the foregoing, we find that Brown did not have apparent authority to bind Martin to the arbitration provision in the admission agreement. This argument is without merit.
 

 B. Third-Party Beneficiary
 

 ¶ 21. Next, Monticello and Comm-Care argue that Brown had the authority to bind Martin because he was a third-party beneficiary to the contract.
 

 ¶ 22. “[N]on-signatories may be bound by an arbitration agreement if they are determined to be a third-party beneficiary.”
 
 McFarlan,
 
 995 So.2d at 783(¶ 25) (citations omitted). To determine whether the decedent was a third-party beneficiary to the contract, the Court must consider whether: (1) the contract was entered into for the benefit of the decedent; (2) whether the promisee owed a legal obligation to the third party; and (3) whether that legal obligation con
 
 *179
 
 nected the third party to the contract.
 
 Id.
 
 at 782(¶ 21).
 

 ¶ 23. In
 
 McFarlan,
 
 the decedent was admitted to a nursing home under an admission agreement that contained an arbitration provision.
 
 Id.
 
 at 779(¶ 2). This Court found that Mary Louise McFarlan’s granddaughter did not qualify as a healthcare surrogate and lacked the authority to bind her to the arbitration provision of the admission agreement because there was no evidence that a physician had determined that McFarlan was incapacitated.
 
 Id.
 
 at 780(¶ 10). However, the Court found the following:
 

 Although McFarlan did not sign the admission agreement, many other factors indicate that she is a third-party beneficiary to the agreement. She is named at the top of the agreement as the resident to be admitted to Forest Hill. The plain language of the contract refers numerous time to benefits and responsibilities of both the resident and the responsible party. The benefits of residing at Forest Hill flow directly to McFarlan as a result of the agreement. By the terms of the contract, Forest Hill incurred a legal duty to care for McFar-lan and provide services directly to her including “room, board, linens and bedding, nursing care, and certain personal services.”
 

 McFarlan’s care was not incidental to the contract, but instead was the essential purpose of the agreement....
 

 Based on the foregoing, the Court found that McFarlan was bound by the arbitration agreement as a third-party beneficiary.
 
 Id.
 
 at 783 (¶¶ 23-24).
 

 ¶ 24. The case at bar is distinguishable from
 
 McFarlan.
 
 Martin’s case is similar to
 
 Hinyub.
 
 In
 
 Hinyub,
 
 the decedent was admitted to a nursing home in 1997 under an admission agreement that
 
 did not
 
 contain an arbitration provision.
 
 Hinyub,
 
 975 So.2d at 213(¶ 2). Several years later, the decedent was temporarily discharged from the nursing home to obtain treatment in a hospital.
 
 Id.
 
 The decedent was later readmitted to the nursing home under a second admission agreement that contained an arbitration clause; he died the next day.
 
 Id.
 
 The language in the admission agreement stated that the execution of the arbitration provision was not a precondition for the decedent to receive services at the facility.
 
 Id.
 
 at 218(¶ 16). The supreme court found that, since “the arbitration provision was not a part of the consideration necessary for [the decedent’s] admission to [the nursing home] ...,” the decedent’s daughter did not have authority to bind him to the arbitration provision as his healthcare surrogate.
 
 Id.
 
 at 218(¶ 17).
 

 ¶ 25. In this case, Martin was admitted into LCNC under an admission agreement that
 
 did not
 
 contain an arbitration provision. The arbitration provision was included in a second admission agreement, which was executed after Montieello took over operations of LCNC. According to the deposition of Calhoun, who was a LCNC employee, the residents were not required to execute the new admission agreement to remain at the facility. Thus, the arbitration provision was not a part of the consideration necessary for Martin to remain at LCNC and was not entered into for Martin’s benefit. Based on the foregoing, we find that Brown did not have authority to bind Martin as a third-party beneficiary to the arbitration provision contained in the 2001 admission agreement. This issue is without merit.
 

 C. Healthcare Surrogate
 

 ¶ 26. Last, Montieello and Comm-Care argue that Brown had authority to bind Martin as his healthcare surro
 
 *180
 
 gate pursuant to Mississippi Code Annotated section 41-41-211 (Rev.2005).
 

 ¶ 27. Section 41-41-211 provides, in pertinent part, that:
 

 (1) A surrogate may make a health-care decision for a patient who is an adult or emancipated minor
 
 if the patient has been determined by the primary physician to lack capacity and no agent or guardian has been appointed or the agent or guardian is not reasonably available.
 

 (2) An adult or emancipated minor may designate any individual to act as surrogate by personally informing the supervising health-care provider. In the absence of a designation, or if the designee is not reasonably available, any member of the following classes of the patient’s family who is reasonably available, in descending order of priority, may act as surrogate:
 

 (a) The spouse, unless legally separated;
 

 (b) An adult child;
 

 (c) A parent; or
 

 (d) An adult brother or sister.
 

 (Emphasis added). Thus, as Martin’s sister, Brown could only make healthcare decisions for him if: (1) his primary physician determined that he lacked capacity, and (2) no other agent had been appointed or that agent was not reasonably available.
 

 ¶28. As previously mentioned, neither party has submitted a statement from Martin’s primary physician, stating that Martin lacked capacity. However, Monticello and Comm-Care argue that Brown admitted in a hearing in 2006 that Martin lacked capacity.
 

 ¶ 29. In
 
 Brown,
 
 the decedent and her daughter signed a nursing home admission agreement, which contained an arbitration provision.
 
 Brown,
 
 949 So.2d at 735-36(¶ 5). The plaintiffs argued that the agreement was unconscionable because the decedent was incompetent, lacking the ability to enter into a contract, and her daughter lacked the authority to bind her in healthcare matters.
 
 Id.
 
 Neither party submitted a declaration by the decedent’s primary physician, stating that she lacked capacity.
 
 Id.
 
 at 736-37(¶ 10). However, the supreme court found that the decedent lacked capacity by virtue of admission by her representatives and corroborating evidence provided by the admitting physician at the hospital.
 
 Id.
 
 Based on the foregoing, the supreme court found that the daughter was a healthcare surrogate and possessed the authority to bind her mother in healthcare matters.
 
 Id.
 

 ¶ 30. In the case at bar, Brown stated in her deposition that Martin was capable of making decisions for himself. However, at the 2006 hearing on the motion to compel arbitration, Brown stated that Martin was not capable of making decisions for himself. The statute provides that the determination of incapacity must be made by a primary physician. Miss.Code Ann. § 41-41-211(1). Unlike the facts in
 
 Brown,
 
 there is no corroborating evidence by a physician that Martin lacked the capacity to make healthcare decisions for himself. Absent such evidence, we cannot find that Martin lacked capacity to make healthcare decisions for himself. We find that there is insufficient evidence in the record to support a finding of fact that Martin lacked capacity. Thus, Brown could not make healthcare decisions for Martin as his healthcare surrogate.
 

 ¶ 31. In addition, in order for Brown to qualify as Martin’s healthcare surrogate, the statute requires that no other agent had been appointed to act on Martin’s behalf. Miss.Code Ann. § 41-41-211(1). Peyton was appointed as Martin’s attorney-in-fact to make healthcare decisions for him. Brown was only listed as an
 
 *181
 
 alternate. There is no evidence in' the record that would suggest that Peyton was not
 
 reasonably available
 
 as required by the statute. Because Peyton was appointed as Martin’s attorney-in-fact and there is no proof that Peyton was not reasonably available, we find that Brown did not qualify as a healthcare surrogate. This argument is without merit.
 

 CONCLUSION
 

 ¶ 32. Based on the foregoing, we find that Brown lacked the authority to bind Martin to the arbitration provision contained in the admission agreement based on the theories of actual authority, apparent authority, and as a healthcare surrogate. Also, because the arbitration provision was not a part of the consideration necessary for Martin to remain at LCNC, we find that Martin was not bound to the arbitration provision as a third-party beneficiary to the contract. Thus, no valid arbitration agreement existed between the parties. Accordingly, we find that the trial court properly denied Monticello and Comm-Care’s motion to compel arbitration. Because there was not a valid arbitration agreement between the parties, there is no need for the Court to consider the parties’ remaining arguments.
 

 ¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF LAWRENCE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
 

 LEE AND MYERS, P.JJ., IRVING, GRIFFIS, ISHEE AND ROBERTS, JJ., CONCUR. MAXWELL, J., CONCURS IN PART AND IN THE RESULT. CARLTON, J., CONCURS IN RESULT ONLY. BARNES, J., NOT PARTICIPATING.