**Sammy GROSS, as the Administrator of the Estate of Pauline Tillman Wagner, Deceased and on Behalf of Her Wrongful Death Beneficiaries, Plaintiffs,**

v.

**GGNSC SOUTHAVEN, LLC d/b/a Golden Living Southaven, Golden Gate National Senior Care, LLC, GGNSC Equity Holdings, LLC, GGNSC Clinical Services, LLC, GPH Southaven, LLC, GGNSC Holdings, LLC, GGNSC Administrative Services, LLC, and Beverly Enterprises, Inc., Defendants.**

No. 3:14CV00037–M–A.

United States District Court,
N.D. Mississippi,
Oxford Division.

Signed Feb. 3, 2015.

David A. Couch, David A. Couch PLLC, Little Rock, AR, Peter Byron Gee, Jr., Morgan & Morgan, P.A., Memphis, TN, for Plaintiffs.

Lamar Bradley Dillard, Mitchell, McNutt & Sams, Tupelo, MS, for Defendants.

### *ORDER*

MICHAEL P. MILLS, District Judge.

This cause comes before the court on the motion of Defendants GGNSC Southaven, LLC d/b/a Golden Living Center Southaven, Golden Gate National Senior Care, LLC, GGNSC Equity Holdings, LLC, GGNSC Clinical Services, LLC, GPH Southaven, LLC, GGNSC Holdings, LLC, GGNSC Administrative Services, LLC, and Beverly Enterprises, Inc. (collectively "Defendants"), to Dismiss Proceedings and to Compel Arbitration. Plaintiff Sammy Gross, as the Administrator of the Estate of Pauline Wagner, has responded in oppo-

sition to the motion. The court, having considered the memoranda and submissions of the parties, concludes that the motion is not well taken and should be denied.

This is a wrongful death action arising from the July 12, 2012 death of Pauline Wagner while she was a resident at the GGNSC Southaven nursing home. In its present posture, however, the parties in this case are contesting the issue of whether it should be referred to binding arbitration. Defendants argue that it should, based on the fact that when Wagner was admitted to the nursing home on February 2, 2009, her son, plaintiff Sammy Gross, signed an arbitration agreement on her behalf. In opposing defendants' motion to compel arbitration, plaintiffs emphasize that Wagner's signature is nowhere to be found on the arbitration agreement, and they argue that since no power of attorney or similar document had been executed, Gross lacked legal authority to sign the agreement on his mother's behalf.

After reviewing the parties' initial briefing on this issue, this court conducted its own research and discovered Mississippi authority which it felt needed to be addressed by the parties. Accordingly, this court entered an order on September 3, 2014, directing the parties to address that authority. The parties have done so, and the court is now prepared to consider the merits of the motion to compel arbitration. In arguing that plaintiff had legal authority to sign an arbitration agreement on behalf of his mother, defendants rely upon four primary theories. These theories are actual authority, apparent authority, estoppel, and a third party beneficiary theory. The court will consider these theories in turn.

### *Actual authority/express agency*

The court considers first defendants' argument that plaintiff had actual authority (sometimes referred to as an "express agency") to sign an arbitration agreement on behalf of his mother. As the court noted in its order requesting additional briefing, plaintiff did provide defendants with at least some points to argue on this issue, conceding in his deposition that his mother had entrusted him with authority to manage some of her affairs. The court will quote directly from defendants' brief on this issue:

> In the case at hand, Plaintiff has submitted sworn deposition testimony that he was in fact expressly authorized by Ms. Wagner to execute any and all admission documentation, including the arbitration agreement, on her behalf.
>
> Q. Would you state your full name, please.
>
> A. Sammy Rogers Gross.
>
> . . .
>
> Q. Before Ms. Wagner went to the nursing home, where did she live?
>
> A. With me.
>
> Q. How long had she lived with you before being admitted to Golden Living?
>
> A. Probably about a year.
>
> Q. When she moved in with you, what was her mental state like?
>
> A. It was decent at the time, but going down. She was in the stages of early dementia, but she was still pretty alert.
>
> Q. Would it be fair to say she would have moments that she was—she knew what she was doing and who she was and where she was, and other times, she might be more confused.
>
> A. Correct.

Plaintiff further testified that his name was on his mother's checking account at Regions Bank prior to her nursing home admission, and that she had authorized

**694**

both him and his brother to access to all funds held in said account. His mother also authorized him to execute any and all documents on her behalf at any hospital or other healthcare provider. (*Id.* at pp. 13–14). Ms. Wagner was in full agreement that admission to Golden Living–Southaven was in her best interests in February, 2009, and with that understanding she expressly authorized her son, the Plaintiff, to execute any and all documentation associated with such admission.

[Defendants' brief at 7–8]. Plaintiff further testified that he believed he was acting as his mother's representative in signing the arbitration agreement on her behalf, and he indicated that he would not have signed the agreement if he did not believe that he had authority to do so.

Later in their brief, however, defendants appear to concede that their proof of agency in this case has some weaknesses. In its order requesting additional briefing, one of the cases which the court asked the parties to address was *Cotton v. GGNSC*, No: 3:13cv169 (N.D.Miss.), which is presently pending before Judge Brown in this district. In *Cotton*, Judge Brown entered an order on July 23, 2014 which tentatively concluded that defendants' motion to compel arbitration lacked merit, but she withheld a final ruling on most arbitration issues pending additional discovery.

*Cotton* involves the same defendants and many of the same issues as are present here, and the court accordingly requested that the parties address it. In complying with this court's request, defendants appear to concede that their proof of agency in this case is weaker than in *Cotton*. Specifically, defendants write in their brief that:

Unlike the instant case, however, [the nursing home resident in *Cotton* ] was physically in the hospital room with her daughter as the admission and arbitration agreements were executed, could see and hear what was occurring, was of competent mind, and made no objection nor voiced any opposition to her daughter's actions. These facts raise additional issues pertaining to apparent authority, estoppel and ratification which are not present before this honorable court. Although the two cases have similarities, the differences in the factual evidence presented in each case allow this honorable court, and Judge Brown, to reach their own conclusions as to the enforceability of the respective arbitration agreements.

[Id. at 30–31]. This court will not comment on the proof in Judge Brown's case, but it does conclude that defendants' proof of express agency in this case has a number of weaknesses, and the fact that Wagner was not present when the arbitration agreement was signed is merely one of them.

In the court's view, the weaknesses in defendants' proof of agency in this case are particularly evident when one considers the quite stringent approach which the Mississippi Supreme Court has taken in this context. This court's review of Mississippi case law in this area very strongly suggests, if not definitively establishes, that a formal legal device transferring authority is required in order to confer actual authority to sign a nursing home arbitration agreement on behalf of another.

It appears from the court's review of the authority discussed below that there are two primary legal devices which might serve to confer authority to sign a nursing home arbitration agreement on behalf of another. These two devices are 1) a formal power of attorney or 2) a health care surrogacy pursuant to Miss.Code Ann. § 41–41–211(1). There may well be other

such legal devices (such as conservator-ships or guardianships), but these are the two which are repeatedly mentioned in Mississippi appellate court case law dealing with this issue. The court notes that, in this case, the second device may be taken off the table at the outset, since the Supreme Court has made it clear that health care surrogacies may only confer authority to sign a nursing home arbitration agreement on behalf of another when the agreement is a requirement of admission (and thus, conceptually, within the scope of health care decisions). *Mississippi Care Center of Greenville, LLC v. Hinyub,* 975 So.2d 211, 218 (Miss.2008). It is undisputed that the arbitration contract in this case was not treated as a condition of admission, and the parties thus agree that § 41–41–211(1) is not relevant in this case. That leaves a power of attorney as the sole means by which, the court's review of authority suggests, authority for plaintiff to sign a nursing home arbitration agreement might have been conferred in this case.

It is undisputed that no such power of attorney was executed in this case, and defendants instead rely upon the informal permission which, plaintiff testified, he was given by his mother to manage her affairs. As discussed below, however, this is almost certainly not enough under Mississippi law. In seeking additional briefing on this issue, the court requested that the parties address two Mississippi Supreme Court decisions, discovered in the court's own research, which suggested that such informal permission was insufficient. These two decisions are *Adams Community Care Center, LLC v. Reed,* 37 So.3d 1155 (Miss. 2010) and *GGNSC Batesville, LLC v. Johnson,* 109 So.3d 562 (Miss.2013). The court will discuss these decisions, as well as two additional decisions which, in its view, remove any doubt that a formal power of attorney or similar device is required in this context.

In *Reed,* two sons signed, on behalf of their mother, separate nursing home admission documents which contained arbitration clauses. *Reed,* 37 So.3d at 1156. The Supreme Court in *Reed* noted that separate signed agreements were obtained by the nursing home "because of disagreement among family members as to [the mother's] medical treatment." *Id.* at 1156, n. 1. The Supreme Court did not provide extensive discussion regarding the precise nature of the authority given to the sons to sign the arbitration agreement, but it took care to emphasize that there was "no evidence in the record that James or Larry Wesley had power of attorney at the time each signed the admissions agreements." *Id.* After considering the proof in the record, the Supreme Court in *Reed* concluded that:

> We find that neither James nor Larry Wesley had authority to act as a surrogate on behalf of his mother under Mississippi's Uniform Health–Care Decisions Act. Further, we find that ACNC has failed to put forth any evidence that James or Larry Wesley had either apparent authority or any other legal capacity to bind the dispute to arbitration. Therefore, we affirm the trial court's determination that James and Larry Wesley lacked authority to bind the dispute to arbitration. We affirm the trial court's order denying ACNC's motion to dismiss and compel arbitration.

*Id.* at 1161.

In asserting that *Reed* is distinguishable, defendants argue that the Supreme Court in that case did not specifically hold that the sons lacked "actual authority," or words to that effect, to sign on behalf of their mother. This court does not read the decision so narrowly, however. It seems implicit in *Reed* that, having noted that no power of attorney was executed,

the Court treated a health care surrogacy under Miss.Code Ann. § 41–41–211(1) as being the other means by which one of the sons might have gained actual authority to sign on behalf of their mother. Moreover, there is not a hint in *Reed*, or any other Mississippi Supreme Court decision of which this court is aware, suggesting that informal authority might be sufficient in this regard. There were two sons in *Reed* who apparently believed that they had informal authority to sign on behalf of their mother, and it is quite difficult for this court to believe that the issue of informal authority would not have at least been mentioned by the Supreme Court if such had been a potentially viable option for establishing actual authority.

The court's conclusion in this regard is strengthened by the Supreme Court's 2013 decision in *Johnson*, which involved the same defendant, represented by the same counsel, as in this case. Much like this case (and *Reed*), *Johnson* involved a relative (in that case a sister) signing a nursing home admission agreement and a separate arbitration agreement on behalf of her relative. As it did in *Reed*, the Supreme Court in *Johnson* found that no valid arbitration agreement was executed, and GGNSC argues once again that this decision is distinguishable since the Supreme Court made no express finding of a lack of actual authority. The court finds this argument less than compelling, since the Supreme Court in *Johnson* noted that "[t]he parties concede that Johnson was not Cooper's health-care surrogate under Mississippi Code Section 41–41–211(1) and that Johnson did not possess actual authority over Cooper. *See* Miss.Code Ann. § 41–41–211(1) (Rev.2009)." *Johnson*, 109 So.3d at 565.

Thus, the issue of actual authority was not even raised as an issue on appeal in *Johnson*, which would suggest that it was not deemed to be worth raising. In noting that the parties had conceded that "Johnson did not possess actual authority over Cooper," the Supreme Court in *Johnson* cited Miss.Code Ann. § 41–41–211(1), which confirms the court's impression that this statute represents one of the two primary means by which actual authority to sign a nursing home arbitration agreement on behalf of another may by conferred under Mississippi law. Moreover, as in *Reed*, the court considers what the Supreme Court did *not* say in *Johnson* to be almost as important as what it did say. As in *Reed*, there is no indication in the Supreme Court's opinion in *Johnson* that informal permission might suffice to confer actual authority, even though the sister in that case presumably believed that she had some informal authority to sign the agreement on behalf of her relative.

A third decision which further supports the court's conclusion in this regard is one cited by defendants in their brief: the Mississippi Court of Appeals' 2009 decision in *Monticello Comm. Care Ctr., LLC v. Estate of Martin*, 17 So.3d 172 (Miss.Ct. App.2009). In *Monticello*, the Court of Appeals noted that Martin, an elderly nursing home resident, had executed a "General Power of Attorney," which named his sister Peyton as his attorney-in-fact and which gave her authority to delegate authority to another. *Monticello*, 17 So.3d at 175. The Court further noted that another portion of the agreement, entitled "Durable Power of Attorney for Healthcare," named another sister, Brown, "as an alternate to be used in the event that Peyton was unavailable or unable to act as Martin's attorney-in-fact" regarding health-care decisions. *Id.*

The actual authority issues in *Monticello* arose from the fact that the arbitration agreement in that case was signed by Brown, even though Peyton had not ex-

pressly delegated authority to her. *Id.* In *Monticello,* the nursing home argued that, particularly in light of the fact that no objection was made to Brown signing the arbitration agreement, actual authority should be deemed to exist. *Id.* at 177. The Court of Appeals disagreed, writing that:

> An express agency is created when the principal authorizes someone to act on their behalf. Section 87–3–7 provides, in pertinent part, that there is no special form required for a power of attorney. However, the power of attorney must be a writing that "(a) authorizes an attorney-in-fact or other agent to do, execute or perform any act that the principal might or could do, or (b) evidences the principal's intent to give the attorney-in-fact or agent full power to handle the principal's affairs...." *Id.* "The burden of proving an agency relationship rests squarely upon the party asserting it." It is clear that Martin executed a power of attorney that expressly authorized Peyton to act on his behalf; thus, Peyton was Martin's express agent. There is not, however, any evidence that Peyton or Martin expressly authorized Brown to assume the role of Martin's attorney-in-fact. There is no writing to that effect. We are not convinced that Peyton's alleged failure to object to Brown's actions is evidence of an express authorization. Thus, we find that this argument is without merit.

*Id.* (citations omitted).

Thus, in discussing the actual authority/express agency issue in *Monticello,* the Court of Appeals clearly appeared to assume, as the Supreme Court did in *Reed* and *Johnson,* that some legally recognized vehicle such as a power of attorney or a statutory health care surrogacy was required to allow one relative to sign a nursing home arbitration agreement on behalf of another. Indeed, after raising the express agency issue in the first sentence quoted above, the Court proceeded directly to a discussion of the legal requirements for a power of attorney. This strongly suggests to this court that the Court of Appeals regarded such a device as being necessary to create an express agency in this context. Once again, there is not a hint in *Monticello* or in the other two decisions discussed above that informal permission such as was allegedly present in this case might suffice. Indeed, this court wonders what the point of the Supreme Court and Court of Appeals carefully addressing the requirements of health care surrogacies and powers of attorney would be if proof of informal permission would suffice. Even a defective power of attorney would seem to constitute strong informal proof of an intent to create an agency, and the fact that such informal permission was not discussed in the decisions above clearly suggests that it is insufficient to create an express agency.

As it happens, there is a fourth Mississippi appellate court decision on this issue which, in the court's view, removes any doubt in this regard. In *Mississippi Care Center of Greenville, LLC v. Hinyub,* 975 So.2d 211 (Miss.2008), the Supreme Court unanimously concluded that a daughter did not have actual authority, under either a power of attorney or a health care surrogacy, to sign a nursing home arbitration agreement on behalf of her mother. In so concluding, the Supreme Court noted that while the parties conceded that a power of attorney had been signed, *and an unauthenticated copy of the agreement was actually attached to a brief,* there was no authenticated copy of same in the record and thus, the Court found, insufficient proof of actual agency. *Hinyub,* 975 So.2d at 217. Specifically, the Supreme Court in *Hinyub* wrote that:

This power of attorney was not offered into evidence as an exhibit, nor was it designated as part of the record for this appeal. Instead, there are only references to its existence in the briefs, and Hinyub attached an unauthenticated copy of the durable power of attorney in her brief. "This Court is limited to consideration of the facts in the record, while reliance on facts only disclosed in the briefs is prohibited.".. Without a durable power of attorney contained within the record, this Court is constrained as a matter of law to find that Nancy Hinyub did not have authority to bind her father, Don Wyse, according to such power of attorney, by causing the claims to be submitted to arbitration pursuant to the arbitration agreement within the second admissions agreement executed by Hinyub within hours of her father's death.

*Hinyub*, 975 So.2d at 216–17.

The result in *Hinyub* is arguably a harsh one, but it leaves, in the court's view, no room whatsoever to argue that the Mississippi Supreme Court would consider the sort of informal proof which defendants offer in this case as being sufficient to establish actual authority to sign an arbitration agreement on behalf of another. Indeed, it seems clear that the proof of express authority in *Hinyub*, which included a representation by all parties that a power of attorney had been executed, was vastly stronger than defendants' proof in this case. And yet it was deemed insufficient, just as the proof in this case is even more clearly insufficient.

It strikes this court that *Hinyub* may well represent the furthest the Mississippi Supreme Court could go on this issue without running afoul of the policy provisions supporting the Federal Arbitration Act. As noted by the U.S. Supreme Court in *AT & T Mobility v. Concepcion*, 563 U.S.

321, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), federal courts should not apply state court decisions and laws which treat arbitration contracts more harshly than other contracts. While *Hinyub* (and a number of other recent decisions) may not reflect a great deal of enthusiasm for arbitration on the part of the Mississippi Supreme Court, this court has no reason to suspect that the Supreme Court would require a lesser degree of proof in other contexts where one person seeks to sign important contracts on behalf of another. For example, the court fully expects that, if a son purported to sign a real estate deed on behalf of his mother, Mississippi law would hold that signature to have been without authority, barring a power of attorney which complied with the legal requisites for such. *Hinyub* thus appears to confer upon arbitration contracts the same degree of legal protection which are granted to real estate contracts and other important contracts. This court does not regard this fact as raising *Concepcion* concerns, since the FAA does not require courts to treat arbitration agreements more favorably than other contracts; they may simply not treat them less favorably.

This court can discern good reasons, unrelated to any hostility towards arbitration, as to why Mississippi appellate courts would require that individuals who wish to sign important documents on behalf of their relatives do so pursuant to formal legal devices such as a power of attorney. Clearly, there is a great potential for legal and personal controversies to arise among relatives when, for example, a son or daughter seeks to sign an important contract on behalf of an elderly parent. Some may feel that the signing of such a contract is not in their relative's best interests, while others may have more selfish concerns regarding the depletion of their relative's estate. Family disputes of this

nature are hardly unusual, and formal legal devices serve to clarify exactly which relatives have authority to make important decisions, and it provides some accountability for them in doing so, such as through the imposition of heightened duties of care.

 The court therefore concludes that the Mississippi Supreme Court would regard the informal proof of authority in this case to be clearly insufficient to establish an express agency under Mississippi law. In arguing to the contrary, defendants rely upon authority which is either well off point or actually helpful to the plaintiff. Specifically, defendants write in their brief that:

> It is well settled under Mississippi law that an agency relationship may be express or implied. *Stripling v. Jordan Prod. Co.*, 234 F.3d 863 (5th Cir.2000); *Barnes, Broom, Dallas and McLeod, PLLC v. Estate of Cappaert*, 991 So.2d 1209 (Miss.2008). An express agency relationship exists where the principal authorizes someone to act on his or her behalf. *Monticello Comm. Care Ctr., LLC v. Estate of Martin*, 17 So.3d 172 (Miss.Ct.App.2009). By the Plaintiff's own sworn testimony, his mother expressly authorized him to execute the admission documentation and arbitration agreement on her behalf. This is binding proof of authority, and there exist no facts to the contrary. *See Walters v. Stonewall Cotton Mills* [136 Miss. 361], 101 So. 495 (Miss.1924) (holding an agent's testimony is competent to establish the facts of an agency); *Cosmopolitan Ins. Co. v. Capitol Trailer & Body, Inc.* [244 Miss. 607], 145 So.2d 450 (Miss. 1962) (holding an agent may testify as to his own agency).

The court has reviewed each of these decisions, and most of them bear no resemblance whatsoever to the nursing home arbitration context before the court, and

the one decision which does—*Monticello*—actually supports plaintiff's argument on this issue, for the reasons previously discussed. The court therefore concludes that the plaintiff in this case lacked actual authority to sign an arbitration agreement on behalf of his mother, and it will proceed to defendants' next argument.

### *Apparent authority*

 The court next addresses defendants' contention that plaintiff had apparent authority to sign an arbitration agreement on behalf of his mother. It is well settled that to establish apparent authority defendants "must put forth sufficient evidence of (1) acts or conduct *of the principal* indicating the agent's authority, (2) reasonable reliance upon those acts by a third party, and (3) a detrimental change in position by the third person as a result of that reliance." *Johnson*, 109 So.3d at 565 (*citing Reed*, 37 So.3d at 1160.) (emphasis added). Thus, the Mississippi Supreme Court has made it clear, in the apparent authority context, that it is the "acts and conduct" of the principal (i.e. Ms. Wagner) which are relevant, rather than those of the alleged agent (i.e. the plaintiff).

 In light of this authority, it is exceedingly difficult for defendants to even argue the issue of apparent authority, since they have conceded that Wagner was not even present when the arbitration agreement was signed. The court can discern no conceivable argument that defendants relied upon representations by Ms. Wagner that her son had authority to act for her, when she was not even present when the arbitration agreement was signed and thus could have made no such representations. Moreover, it would appear to this court that, to be sufficient, any representations of actual authority would need to be representations of authority

(such as a power of attorney) which is actually sufficient under Mississippi law. Perhaps a representation by a resident to a nursing home that her relative was authorized by a power of attorney to sign on her behalf would be sufficient to confer apparent authority. Perhaps not. Regardless, there is clearly insufficient proof of any apparent agency in this case, and the court will therefore turn to defendants' estoppel arguments.

### Estoppel

■ Similarly without merit are GGNSC's arguments that plaintiff should be estopped from denying that he was authorized to sign for his mother. Defendants note that "an estoppel may arise from the making of a promise, even though without consideration, if it was intended that the promise should be relied upon and in fact it was relied upon, and if a refusal to enforce it would be virtually to sanction the perpetuation of fraud or would result in other injustice. 28 Am.Jur.2d, *Estoppel and Waiver,* § 48 (1996)." *C.E. Frazier Construction Co. v. Campbell Roofing and Metal Works, Inc.,* 373 So.2d 1036, 1038 (Miss.1979). Further, "one may be held an agent by estoppel only when from all of the circumstances he realizes or should realize the substantial likelihood that the party suffering the loss will justifiably rely on the tacit representation of agency arising from his conduct." *Alabama G.S.R. Co. v. McVay,* 381 So.2d 607, 612 (Miss. 1980).

■ Based upon this authority, defendant argues that "plaintiff was fully aware that GGNSC was relying on his representations of authority to act on behalf of Ms. Wagner," but the court finds this argument to be rather disingenuous. As a nursing home which is actively involved in arbitration litigation in this state, GGNSC was aware (or should have been) of *Hi-*

*nyub* and similar decisions in which the Mississippi Supreme Court required proof of a power of attorney or similar legal device to establish actual authority.

In this case, there is no indication in the record that plaintiff represented that he was acting pursuant to a valid power of attorney in signing for his mother. Even if he had, it is unclear to this court why GGNSC would not have asked, based on *Hinyub,* to see a copy of that power of attorney before allowing him to sign. Regardless, defendants have presented no Mississippi authority suggesting that informal permission would have allowed plaintiff to sign an arbitration agreement on behalf of his mother, and that is all the authority that he represented he had. Thus, even assuming (as seems to be the case) that plaintiff genuinely believed that he had authority to sign for his mother by virtue of an informal agency and that he so represented to GGNSC, it knew or should have known that he did not actually possess sufficient legal authority under Mississippi law.

This court's views on the estoppel issue are also informed by another nursing home arbitration case involving GGNSC which is pending before it, as to which the parties have submitted briefing: *Freeman v. GGNSC,* No: 3:14cv97 (N.D.Miss.) Having reviewed the briefing in *Freeman,* this court is beginning to discern a pattern in GGNSC's approach to arbitration cases. That pattern is as follows: GGNSC's representatives approach an individual lacking in legal training who is engaged in the difficult process of admitting a relative to a nursing home. GGNSC proceeds to obtain the relative's signature on the arbitration agreement without any indication that there is a valid power of attorney or other formal legal device in effect, as Mississippi case law strongly suggests is necessary.

Once a lawsuit is filed, GGNSC's strategy appears to be to take the deposition of the relative who signed the arbitration agreement and then assert estoppel and/or agency based on that testimony, regardless of what it might have been. In the instant case, the plaintiff testified that he ·believed that he acted with authority in signing the arbitration agreement. GGNSC has responded with an argument that estoppel applies because plaintiff represented that he had authority in signing the arbitration agreement and should be estopped from stating otherwise now. In *Freeman,* the relative who signed the arbitration agreement testified that a representative of GGNSC came to her workplace to have her sign nursing home admissions documents, which she hurriedly did without carefully reading them. The relative in *Freeman* conceded that she knew that she was not the resident's legal representative, and GGNSC asserts estoppel based upon that testimony.

GGNSC's position appears to be that, if a relative testifies that he had authority to sign an arbitration agreement on behalf of a relative then estoppel applies and that, if he testifies that he lacked authority to do so, then estoppel applies. GGNSC thus appears to contemplate a "heads I win, tails you lose" legal scenario and promotes a narrative which always seems to involve itself being deceived by relatives of its residents. This court is not particularly receptive to this line of argument, especially since it is GGNSC, rather than' concerned relatives of residents, which should be aware of decisions such as *Hinyub* which so narrowly construe the authority of individuals to sign arbitration agreements on behalf of others. Nowhere in GGNSC's briefing does it concede that it might have had some duty to comply with *Hinyub's* directives and ensure that a par-

ticular relative had executed a power of attorney prior to obtaining his signature.

GGNSC's approach seems even more convenient when one considers the very selective citations to Mississippi authority which it offers in its briefing, including its failure, in its original briefing, to even ·mention the *Johnson* decision, as to which it was a party. As discussed below, GGNSC now concedes that *Johnson* constitutes such adverse authority that it asks for this court to invalidate it under *Concepcion.* While defendant may not have been strictly required to cite this adverse authority, litigants gain credibility with a court when they offer a candid discussion of authority, and they lose it when they do not. The doctrine of estoppel is based heavily upon considerations of equity, and the court does not find the equities to be particularly favorable to GGNSC in this case. The court accordingly concludes that the doctrine of estoppel is inapplicable in this case, and it turns to defendants' next argument.

### Third party beneficiary

The court next addresses defendants' argument that Wagner should be considered a third-party beneficiary of the arbitration agreement, so as to permit GGNSC to enforce its provisions against her estate. The court acknowledges that, at one time, Mississippi law appeared to support defendants' position on this issue. Indeed, in the 2008 decision of *Forest Hill Nursing Center, Inc. v. McFarlan,* 995 So.2d 775 (Miss.App.2008), the Mississippi Court of Appeals held that, even though a nursing home resident's granddaughter who signed an arbitration agreement on his behalf lacked actual or apparent authority to do so, the resident was still considered a third party beneficiary of the arbitration contract so as to permit it to be enforced against her.

Based on *McFarlan*, this court and a number of other federal courts compelled arbitration in nursing home cases under a third party beneficiary theory, under circumstances similar to those in this case. *See, e.g. Cook v. GGNSC Ripley, LLC*, 786 F.Supp.2d 1166, 1171 (N.D.Miss.2011). This court regards *Johnson* as having implicitly overruled *McFarlan*, however. Indeed, the Supreme Court in *Johnson* could not have been clearer that a third party beneficiary theory could not negate the basic requirement that the initial arbitration contract be executed between parties who have the legal authority to contract.

The Supreme Court wrote in *Johnson* that "[f]or a third-party beneficiary to exist, a valid contract must first exist," and it emphasized that the formation of a contract requires "mutual assent" by "*parties with legal capacity to make a contract.*" *Id.* at 565 (emphasis in original). This strikes this court as being a very non-controversial holding. Indeed, it is a fundamental requirement of contract law that mutual assent be reached by parties who have authority to contract regarding the issue at hand. In the nursing home arbitration context, the issue at hand is the right of the nursing home resident to bring a lawsuit against the nursing home. This right seems just as personal to the resident as would be the right to contract regarding the selling of his or her home.

Without question, the plaintiff in this case could not have shown up at a real estate closing to sell his mother's home, armed with nothing more than verbal permission and a subjective belief that he was acting in accordance with her wishes. While it might well be said in that situation that all parties would benefit from the selling of the home in some manner, that would not alter the fact that, lacking a power of attorney or similar device, the son simply lacked the authority to do so.

The Supreme Court in *Johnson* made it clear that the same analysis applies in the nursing home arbitration context. Moreover, even though the Supreme Court did not expressly overrule *McFarlan* in *Johnson*, it seems clear to this court that the latter decision is no longer good law. Indeed, the court notes that, in her July 23, 2014 order in *Cotton*, Judge Brown recently rejected third party beneficiary arguments which are very similar to those which defendants raise in this case. In so ruling, Judge Brown noted that a number of federal courts had reached different results, but she emphasized that those decisions preceded *Johnson*. *Cotton*, slip. op. at 8, n. 3. This court agrees with Judge Brown that *Johnson* constitutes a "game changer" in this context.

 Defendants implicitly concede that *Johnson* is highly adverse authority for them, since they argue, based on *Concepcion*, that this court should refuse to apply the decision as contrary to the policy provisions of the FAA. This court declines defendants' invitation to do so. While this court recognizes its duty under *Concepcion* to ensure that a particular rule of state law does not treat arbitration agreements more harshly than it does other contracts, it does not find that to be the case with *Johnson*.

As stated previously, the court regards *Johnson* as being consistent with basic principles of contract law, the most fundamental of which is a requirement that mutual assent be reached by parties with authority to contract regarding the issue at hand. Moreover, the court has no reason to suspect that the same principles which were applied by the Supreme Court in *Johnson* would not be applied in other situations involving the signing of important legal contracts. In their briefing, defendants argue otherwise, writing that:

To the extent the Mississippi appellate courts have treated arbitration agreements any differently than other contracts, such a heightened standard is preempted by the FAA. The opinion in Johnson runs afoul of the rule against "prohibit[ing] outright the arbitration of a particular type of claim" by analyzing the enforcement of arbitration agreements in the nursing home context differently than arbitration agreements in other cases to implicitly prohibit arbitration of claims against nursing homes. [Defendants' brief at 18].

In setting forth the Mississippi authority which, they contend, treated non-arbitration contracts less harshly, defendants write that:

In *Johnson*, before reaching the third party beneficiary analysis the Court imposed a requirement of actual or apparent authority. Historically, Mississippi courts have not imposed an actual or apparent authority requirement to find third party beneficiary.

A person or entity may be deemed a third-party beneficiary if: (1) the contract between the original parties was entered for that person's or entity's benefit, or the original parties at least contemplated such benefit as a direct result of performance; (2) the promisee owed a legal obligation or duty to that person or entity; and (3) the legal obligation or duty connects that person or entity with the contract. *Burns v. Washington Savings*, 251 Miss. 789, 796, 171 So.2d 322, 325 (1965) (citing 17A C.J.S. Contracts § 519(4) (1963)). In *Yazoo & M.V.R. Co. v. Sideboard*, 161 Miss. 4, 133 So. 669 (1931), this Court offered the following analysis for determining third-party-beneficiary status:

(1) When the terms of the contract are expressly broad enough to include the third party either by name as one of a specified class, and (2) the said third party was evidently within the intent of the terms so used, the said third party will be within its benefits, if (3) the· promisee had, in fact, a substantial and articulate interest in the welfare of the said third party in respect to the subject of the contract. *Sideboard*, 161 Miss. at 15 [133 So. 669].

*Simmons Housing, Inc. v. Shelton*, 36 So.3d 1283, 1286–87 (Miss.2010). Other Mississippi appellate court opinions have enforced arbitration agreements against nonsignatories, absent any showing of authority to act by the actual signatory. *See, e.g., Smith Barney v. Henry*, 775 So.2d 722 (Miss.2001) (enforcing arbitration agreement against successors under will); *Terminix, Int'l, Inc. Ltd. Part. v. Rice*, 904 So.2d 1051 (Miss.2004) (binding wife to arbitration agreement where only husband signed). A requirement of actual or apparent authority as a prerequisite to application of the third party beneficiary doctrine is nonsensical, since if actual or apparent authority existed there would be no need for a third party beneficiary argument. [*Id.* At 19].

In so arguing, defendants overlook a crucial point. Namely, defendants fail to acknowledge the basic requirement, in the authority they cite, that there be a "contract between the original parties." *Burns*, 171 So.2d at 325. The court reads *Johnson* as standing for the basic, and quite sound, proposition that one cannot be a third party beneficiary of a non-existent contract. Moreover, for a contract to form in the first place, there must be mutual assent by parties who have the authority to contract regarding the issue at hand. The court has reviewed the cases cited by defendants, and, in each of them, there

was an initial contract which was agreed to by parties who had the authority to enter into that contract. That is not the case here.

■ In this case, the plaintiff purported to sign an arbitration agreement on behalf of his mother, even though there was no power of attorney or other legal device which gave him authority to do so. *Hinyub* and similar decisions discussed previously make it clear that such was improper. In light of the foregoing, no valid arbitration contract was formed in this case under Mississippi law, and there is accordingly no argument that Wagner was the third party beneficiary of a non-existent contract. Once again, this court has no reason to suspect that a different result would be reached under Mississippi law if the plaintiff in this case had purported to sign a deed or any other important legal contract on behalf of his mother. Moreover, GGNSC's repeated arguments that it has been deceived by relatives of its residents appears to offer strong indirect support for the Mississippi Supreme Court's approach in *Hinyub* and *Johnson* of requiring strict compliance with contractual formalities before an individual may sign an arbitration agreement on behalf of a relative. By requiring a formal legal device such as a power of attorney, the Supreme Court takes these issues out of the realm of subjective and often disingenuous arguments of deceit and into the realm of clear and verifiable contractual language.

It strikes this court that defendant and other nursing homes in this state face a very fundamental problem in seeking to enter into arbitration agreements with their residents. That problem is that, unlike in most arbitration contexts, they are frequently seeking to enter into contracts with elderly or disabled individuals who lack the legal capacity to contract. Moreover, there are quite limited legal devices by which authority to contract may be transferred to another person under Mississippi law, and many, if not most, residents will not have executed such a device. In cases where a potential resident lacks the mental capacity to contract and has not executed a power of attorney or similar device, it appears that nursing homes will need to decide whether it is more important to them to have the resident's business or to have a valid arbitration agreement. In light of *Johnson, Hinyub* and similar decisions, it does not appear that they can have both, at least in the typical case.

The policy considerations supporting the FAA are strong, but they are not so strong, indeed they do not purport, to negate the basic contractual requirement of mutual assent between parties who have the legal capacity to contract. Arbitration contracts are favored under the law, but they are still contracts, and they are not immune from the legal requirements relating to such. The Supreme Court acknowledged as much in *Concepcion*,[1] and the court does not read that decision as constituting a basis for invalidating the Supreme Court's decision in *Johnson*. Defendants argue, with considerable hyperbole, that the Supreme Court's approach precludes arbitration of nursing home claims outright, but that is simply not the case. Indeed, even in *Hinyub*, arbitration could have presumably been compelled if the nursing home had simply obtained and produced an authenticated copy of the power of attorney which had been execut-

---

1. *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 131 S.Ct. 1740, 1746, 179 L.Ed.2d 742 (2011) (noting that section 2 of the FAA "permits arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract.'")

ed. That does not strike this court as being a particularly onerous burden.

The court finally notes that yet another serious obstacle faces defendants in their attempts to compel arbitration in this case. Specifically, the arbitration agreement at issue here contemplated arbitration being conducted by the National Arbitration Forum (NAF), but this organization has stopped arbitrating consumer disputes. Moreover, defendants concede that, in *GGNSC Tylertown, LLC v. Dillon,* 87 So.3d 1063 (Miss.Ct.App.2011), the Mississippi Court of Appeals found an "entire arbitration agreement in a nursing home case to be void and unenforceable, because the NAF was unavailable to arbitrate the claim." [Brief at 20]. Defendants appear to concede that *Dillon* would bar arbitration of the dispute in this case, but they argue that the decision should be held invalid under *Concepcion.* This court declines to address this issue in light of the fact that arbitration is not, in its view, available in this case, regardless of the availability of the NAF as a forum. In the event that the Fifth Circuit should disagree with this court's findings in this order, then it may proceed to consider whether *Dillon* violates *Concepcion,* so as to permit arbitration in this case to go forward. For its part, this court simply concludes that no valid arbitration agreement was executed in this case and that defendants' motion to compel arbitration is due to be denied.

It is therefore ordered that defendants' motion to dismiss and compel arbitration is denied.