# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

March 14, 2016

Lyle W. Cayce
Clerk

————

No. 15-60124

————

SAMMY GROSS, as the Administrator of the Estate of Pauline Tillman Wagner, Deceased and on Behalf of her Wrongful Death Beneficiaries,

      Plaintiff - Appellee

v.

GGNSC SOUTHAVEN, L.L.C., doing business as Golden Living Southaven; GOLDEN GATE NATIONAL SENIOR CARE, L.L.C.; GGNSC EQUITY HOLDINGS, L.L.C.; GGNSC CLINICAL SERVICES, L.L.C.; GPH SOUTHAVEN, L.L.C.; GGNSC HOLDINGS, L.L.C.; GGNSC ADMINISTRATIVE SERVICES, L.L.C.; BEVERLY ENTERPRISES, INCORPORATED,

      Defendants - Appellants

————————————————

Cons. w/ No. 15-60248

SHIRLEY COTTON, As the Adminstratrix of the Estate of Ida Roberson, deceased and on Behalf of her Heirs and Wrongful Death Beneficiaries,

      Plaintiff - Appellee

v.

GGNSC BATESVILLE, L.L.C., doing business as Golden Living Center Batesville; GGNSC ADMINISTRATIVE SERVICES, L.L.C.,

      Defendants – Appellants

No. 15-60124 cons. w/ No. 15-60248

Appeals from the United States District Court
for the Northern District of Mississippi

Before STEWART, Chief Judge, and KING and HIGGINSON, Circuit Judges.
STEPHEN A. HIGGINSON, Circuit Judge:

Pauline Tillman Wagner and Ida Roberson died in Mississippi nursing homes run by Golden Living Southaven and Golding Living Center Batesville, respectively. Thereafter, Wagner's son, Sammy Gross, and Roberson's daughter, Shirley Cotton, sued the nursing homes in Mississippi state court. Southaven and Batesville removed the cases to federal court and moved to compel arbitration on the basis of arbitration agreements that the adult children had signed for their mothers when their mothers were admitted to the homes. Both district courts denied the motions to compel. The two cases present similar issues, so we have consolidated them for consideration on appeal.

**I.**

**A. Gross**

When Gross helped move Wagner into Southaven in 2009, he was presented with a sheaf of admission-related papers to sign on her behalf. Among them was an arbitration agreement. Gross signed it and everything else he was handed that day. Wagner had orally authorized Gross to manage certain of her affairs and accounts, but she never signed a written durable power of attorney or a medical-care surrogacy formally authorizing Gross to make decisions on her behalf. Wagner died in 2012. Gross, in his capacity as "Administrator of the Estate of Pauline Tillman Wagner," sued Southaven in Mississippi state court, asserting claims for negligence, medical malpractice,

2

No. 15-60124 cons. w/ No. 15-60248

and wrongful death on behalf of Wagner's heirs and wrongful death beneficiaries.

Southaven removed the case to federal court and moved to compel arbitration on the basis of the arbitration agreement. In an opinion reasoned under Mississippi law, Judge Mills denied the motion, holding that Gross did not have actual agency authority to sign the agreement on Wagner's behalf. Judge Mills held that "informal proof" of orally conveyed authority is insufficient to bind a nursing-home resident to an arbitration agreement and that "a formal legal device," such as a "formal power of attorney" or a statutory health-care surrogacy, "is required in order to confer actual authority to sign a nursing home arbitration agreement on behalf of another." Judge Mills concluded that "Mississippi case law . . . very strongly suggests" that a formal legal device is required. Judge Mills also rejected Southaven's arguments that the agreement should be enforced on the basis of equitable estoppel or third-party beneficiary doctrine. Gross timely appealed, challenging only the actual authority and estoppel holdings.

**B. Cotton**

Cotton arranged for Roberson to move into Batesville in April 2011, after Roberson suffered a stroke. A Batesville employee, Jessica Butler, came to meet with Cotton at the hospital where Roberson was recovering. Butler brought a stack of admissions-related documents, including an arbitration agreement. Although Roberson was in the room during the meeting, Butler gave all of the documents to Cotton. Cotton signed them all.

Two months earlier, in February 2011, Roberson had sought to execute a power of attorney in favor of Cotton and her sister, Annie Reed. Although the

document was notarized, Roberson never signed it.[1] Cotton presented the notarized but unsigned power of attorney to Butler at the hospital.

Roberson died in October 2011, five months after she entered Batesville. Thereafter, Cotton, in her capacity as "Administratrix of the Estate of Ida Roberson," sued Batesville in Mississippi state court, asserting claims for negligence, medical malpractice, and wrongful death on behalf of Roberson's heirs and wrongful death beneficiaries.

Batesville removed the case to federal court and moved to compel arbitration on the basis of the arbitration agreement. The district court, adopting the reasoning of Judge Mills's decision in *Gross v. GGNSC Southaven, LLC*, 83 F. Supp. 3d 691 (N.D. Miss. 2015), described above, denied the motion. Following *Gross*, it held that, in the absence of an executed durable power of attorney or other formal legal device, Cotton necessarily lacked actual authority under Mississippi law to execute an arbitration agreement. The district court also rejected Golden Living's arguments that the agreement should be enforced on the basis of apparent authority, equitable estoppel, or ratification. Cotton timely appealed, challenging all four holdings.

## II.

We review de novo a district court's denial of a motion to compel arbitration. *See Am. Heritage Life Ins. Co. v. Lang*, 321 F.3d 533, 536 (5th Cir. 2003). We also review de novo a district court's interpretation of state law. *Marino v. Dillard's, Inc.*, 413 F.3d 530, 532 (5th Cir. 2005). We review its findings of fact for clear error. *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 256 (5th Cir. 2014). We review for abuse of discretion a district court's determination of whether equitable estoppel may be invoked to

---

[1] To be valid and enforceable under Mississippi law, a power of attorney must be (1) written, (2) signed by the principal, and (3) "express[] plainly the authority conferred." *Miss. Care Ctr. of Greenville, LLC v. Hinyub*, 975 So. 2d 211, 216 (Miss. 2008).

No. 15-60124 cons. w/ No. 15-60248

compel arbitration. *Auto Parts Mfg. Miss., Inc. v. King Constr. of Houston, L.L.C.*, 782 F.3d 186, 196 (5th Cir.), *cert. denied sub nom. Noatex Corp. v. Auto Parts Mfg. Miss. Inc.*, 136 S. Ct. 330 (2015). A district court abuses its discretion if it premises its decision on an erroneous application of the law or a clearly erroneous assessment of the evidence. *See id.*

## III.

Southaven and Batesville both challenge the district courts' holdings as to actual authority and estoppel.

### A. Actual Authority

Southaven and Batesville both argue that the district courts erred in adopting a formal legal-device requirement for a party to prove actual authority to sign a nursing-home arbitration agreement.

#### i.    Gross

The district court in *Cotton* adopted the reasoning of Judge Mills's opinion in *Gross* on this issue, so we begin by examining the *Gross* decision. Southaven argues that the district court erred when it held that, under Mississippi law, Gross lacked actual agency authority to sign the arbitration agreement for Wagner. It asserts that, at the time Gross signed the agreement, he had been "authorized by Ms. Wagner to act as her express agent in all regards, and to execute any and all [Southaven] documents, including the arbitration agreement, on her behalf." As proof of Gross's agency authority, Southaven submitted to the district court portions of Gross's deposition, in which Gross testified about his understanding of his authority to act for his mother.

When evaluating a district court's decision on a motion to compel arbitration under the Federal Arbitration Act, 9 U.S.C. §§ 1–16, we first must determine "whether the parties agreed to arbitrate the dispute in question." *Tittle v. Enron Corp.*, 463 F.3d 410, 418 (5th Cir. 2006). That determination

5

involves two questions: "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Id.* at 418–19. Here, the parties dispute only the first question: the validity of the agreement. Although there is a strong federal policy favoring arbitration, the "federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Am. Heritage*, 321 F.3d at 537–38. Instead, we "apply ordinary state-law principles that govern the formation of contracts." *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996).

Under Mississippi law—which the parties agree applies here—for a contract to be valid, there must be, among other things, "mutual assent" between "parties with legal capacity to make a contract." *Grenada Living Ctr., LLC v. Coleman*, 961 So. 2d 33, 37 (Miss. 2007). Here, Southaven contends that Gross had capacity to enter into the agreement on his mother's behalf by virtue of actual agency authority. "The burden of proof as to the existence of an agency relationship rests with the party asserting it." *Aladdin Constr. Co., Inc. v. John Hancock Life Ins. Co.*, 914 So. 2d 169, 177 (Miss. 2005). Here, therefore, the burden rests on Southaven. After examining Mississippi case law, Judge Mills held that "a formal legal device," such as a "formal power of attorney" or a statutory health-care surrogacy, "is required in order to confer actual authority to sign a nursing home arbitration agreement on behalf of another." Consequently, Judge Mills held that the evidence that Southaven submitted—Gross's deposition testimony—was insufficient as a matter of law to establish the existence of an agency relationship.

No decision of the Mississippi Supreme Court precisely answers the question whether Mississippi law requires a formal legal document to confer actual agency authority to sign an arbitration agreement for another. Hence the district court made an "*Erie*" guess" as to how that court would resolve the

No. 15-60124 cons. w/ No. 15-60248

issue. We do the same, de novo, on review. *Estate of Bradley ex rel. Sample v. Royal Surplus Lines Ins. Co.*, 647 F.3d 524, 529 (5th Cir. 2011); *see Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). When making an *Erie* guess, this court looks to:

> (1) decisions of the Mississippi Supreme Court in analogous cases, (2) the rationales and analyses underlying Mississippi Supreme Court decisions on related issues, (3) dicta by the Mississippi Supreme Court, (4) lower state court decisions, (5) the general rule on the question, (6) the rulings of courts of other states to which Mississippi courts look when formulating substantive law and (7) other available sources, such as treatises and legal commentaries.

*Centennial Ins. Co. v. Ryder Truck Rental, Inc.*, 149 F.3d 378, 382 (5th Cir. 1998).

"Under Mississippi law, an agent's '[a]ctual authority may be express or implied.'" *Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Republic of Venezuela*, 575 F.3d 491, 500 (5th Cir. 2009) (quoting *Migerobe, Inc. v. Certina USA, Inc.*, 924 F.2d 1330, 1336 (5th Cir. 1991)). "It is deemed express if granted in either written or *oral* specific terms." *Id.* According to the Restatement (Third) of Agency, which Mississippi courts consult, *see id.*, "[a]ctual authority . . . is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf." Restatement (Third) of Agency § 3.01 (2006). From the foregoing, this court has previously concluded that "[i]t is clear . . . that the authority to enter a contract may be conveyed orally and that no formal writing is required as a general rule of Mississippi law."[2]

---

[2] There are some exceptions to the general rule. *See, e.g.*, *Kountouris v. Varvaris*, 476 So. 2d 599, 603 (Miss. 1985) (noting that, pursuant to Mississippi statute, in order for an agent to convey an interest in Mississippi land with priority over subsequent purchasers for value and without notice, or subsequent judgment lien creditors, authority to convey the interest must be acknowledged and recorded like an instrument of conveyance of realty); *Northrop Grumman*, 575 F.3d at 500 (explaining that, in Mississippi, for contracts subject to

*Northrop Grumman*, 575 F.3d at 500. The district court's requirement of a formal legal device to create the authority to contract thus runs contrary to this general rule in Mississippi agency law.

In addition to lacking a basis in general Mississippi agency law, a formal-device requirement also stands in tension with the Federal Arbitration Act, 9 U.S.C. §§ 1–16. Section 2 of the Act provides, in relevant part, that:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. As the Supreme Court has emphasized, "courts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations omitted). The final phrase of § 2—"save upon such grounds as exist at law or in equity for the revocation of any contract"—permits courts to invalidate arbitration agreements according to "generally applicable contract defenses, such as fraud, duress, or unconscionability," but not according to arbitration-specific rules or defenses. *Id.*; *see Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1204 (2012) (noting that arbitration agreements can be invalidated pursuant to "state common law principles that are not specific to arbitration and pre-empted by the FAA"). To require a "formal legal device[] such as a power of attorney" specifically for arbitration agreements and other "important contracts" is in tension, at the very least, with *Concepcion*, which disapproved of nominally neutral rules that, in

---

public-contracts doctrine, the applicable "government entity has the power to define how and when it enters a contract, and, by extension, how and when its agents have authority to create contracts on its behalf"). The district court's decision would create a new exception, for nursing-home arbitration agreements and other "important contracts."

practice, "would have a disproportionate impact on arbitration agreements." 563 U.S. at 342. It is hard to see how the district court's categorical rule that nonsignatories can be bound by nursing-home arbitration agreements only if the signatory possessed a durable power of attorney or other "formal legal device[]" would not, in practice, disproportionately impact arbitration agreements. Thus, our best *Erie* guess is that the Mississippi Supreme Court would not adopt the district court's formal-device requirement.

Two Mississippi actual-authority cases relied upon by the district court—*Mississippi Care Center of Greenville, LLC v. Hinyub*, 975 So. 2d 211 (Miss. 2008) and *Monticello Community Care Center, LLC v. Estate of Martin ex rel. Peyton*, 17 So. 3d 172 (Miss. Ct. App. 2009)—do not require a different result.[3] We read both cases to stand for the unremarkable proposition that the party with the burden of proving an agency relationship must present sufficient evidence of the existence and scope of the relationship. We do not read either case to require that the evidence be of a particular kind—whether a "formal legal device" or something else. In *Hinyub*, the Mississippi Supreme Court noted that the only evidence of an agency relationship was an unauthenticated copy of a durable power of attorney that had been attached to the plaintiff's brief on appeal. 975 So. 2d at 217. Although both parties in *Hinyub* referred to the power of attorney in their briefs, the power of attorney "was not offered into evidence as an exhibit, nor was it designated as part of the record [on] appeal." *Id*. Stating that the court was "limited to consideration of the facts in the record," and that "reliance on facts only disclosed in the briefs

---

[3] The district court also relied on *GGNSC Batesville, LLC v. Johnson*, 109 So. 3d 562 (Miss. 2013) and *Adams Community Care Center, LLC v. Reed*, 37 So. 3d 1155 (Miss. 2010). *Johnson* concerns apparent authority and third-party beneficiary doctrine. *Reed* concerns health-care surrogacies, apparent authority, and third-party beneficiary doctrine. Neither case addresses the proof required to establish actual agency authority. Hence these cases are not instructive here.

is prohibited," the court held that "without a durable power of attorney contained within the record, this court is constrained as a matter of law to find that Nancy Hinyub did not have authority to bind her father." *Id.* The proof failed not because a power of attorney is the only acceptable proof of agency in Mississippi, but because, other than the power of attorney that the court could not consider, the record contained *no* proof of agency.

In *Monticello*, the nursing-home resident, Martin, had executed a power of attorney that gave his sister, Peyton, authority to act on his behalf in his business and financial affairs. 17 So.3d at 175. His other sister, Brown, also assisted with his care, and, on her visits to the nursing home, often signed documents for him. *Id.* Brown signed an arbitration agreement on his behalf, and the nursing home sought to enforce it, arguing that Brown had actual authority because Peyton, who held the written power of attorney, had not objected to Brown signing documents as Martin's "responsible party." *Id.* at 177. Reiterating that "[t]he burden of proving an agency relationship rests squarely upon the party asserting it," the court of appeals held that Brown did not have express authority. *Id.* It explained:

> It is clear that Martin executed a power of attorney that expressly authorized Peyton to act on his behalf; thus, Peyton was Martin's express agent. There is not, however, any evidence that Peyton or Martin expressly authorized Brown to assume the role of Martin's attorney-in-fact. There is no writing to that effect. We are not convinced that Peyton's alleged failure to object to Brown's actions is evidence of an express authorization.

*Id.* In short, the record in *Monticello* contained no evidence on the issue of express agency besides Peyton's lack of objection. *Id.* Thus, in *Monticello*, as in *Hinyub*, the problem was not that the record did not contain a power of attorney; the problem was that the record contained no evidence on the issue of actual agency authority at all. *See also Forest Hill Nursing Ctr., Inc. v. McFarlan*, 995 So. 2d 775, 781 (Miss. Ct. App. 2008) (holding no actual

authority after noting that "[t]here is *no evidence in the record* that any type of agreement existed between McFarlan and Mathews that would give Mathews the authorization to act on McFarlan's behalf" (emphasis added)). Thus, neither *Hinyub* nor *Monticello* requires us to hold that a power of attorney or other formal legal device is the only way to establish the existence of actual agency authority to sign an arbitration agreement in Mississippi. We hold that the Mississippi Supreme Court would not adopt the district court's formal-device requirement and would instead permit parties to establish the existence of an agency relationship with other types of evidence.

The parties also dispute whether Gross's deposition testimony is permissible as evidence of the alleged agency relationship, and moreover, whether that testimony, standing alone, could be sufficient to prove the relationship. Gross argues that the deposition testimony cannot be considered, lifting out of context the following quotation from *Walters v. Stonewall Cotton Mills*, 101 So. 495, 498 (Miss. 1924): "[N]either the agency nor the scope of the agent can be proven by the declarations alone of the agent." Gross omits the passage that follows, which clarifies:

> [T]hat simply means that the declarations of the agent *off of the witness stand cannot be testified to by others* in order to show his agency and the scope of it. It does not mean that the agent cannot be put on the witness stand and be permitted to testify as any other witness to his agency as well as the scope of his agency.

*Id.* (emphasis added); *see Cosmopolitan Ins. Co. v. Capitol Trailer & Body, Inc.*, 145 So. 2d 450, 453 (Miss. 1962) ("[A] witness can testify from the witness stand about his agency just as any other witness."). Here, Southaven presents Gross's sworn deposition testimony, which does not implicate the evidentiary issues that *Walters* addressed. Also, under Mississippi law, actual authority exists when "at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's

11

No. 15-60124 cons. w/ No. 15-60248

manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) Of Agency § 2.01. It follows that the agent's testimony is competent evidence of actual authority because the agent will usually be the best positioned to testify about his belief at the time he acted. Moreover, the Mississippi Supreme Court has stated in dicta that "[i]n Mississippi, agency and the scope thereof may be proved through the testimony of the agent alone." *Eaton v. Porter*, 645 So. 2d 1323, 1326 (Miss. 1994). Thus, Gross's sworn testimony is competent evidence on the question of Gross's agency and its scope.

The foregoing analysis leaves open whether Southaven has in fact established (1) that Gross had express authority to act on his mother's behalf and (2) that the power to execute an arbitration agreement—that is, the power to relinquish legal rights,[4] in addition to the power to handle medical or financial circumstances—was within the scope of that authority. The existence and scope of an actual agency relationship is a question of fact, *Engle Acoustic & Tile, Inc. v. Grenfell*, 223 So. 2d 613, 617–18 (Miss. 1969), which the district court below did not reach. On this record, we cannot decide the actual agency issue as a matter of law. *See Pullman–Standard v. Swint*, 456 U.S. 273, 291 (1982) ("When an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings[.]"); *cf. Moses H. Cone Mem'l Hosp. v. Mercury*

---

[4] Actions are within the scope of an agent's authority if they are "designated or implied in the principal's manifestations to the agent" or are "acts necessary or incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act." Restatement (Third) Of Agency § 2.02(1). The Restatement explains that "the consequences that a particular act will impose on the principal may call into question whether the principal has authorized the agent to do such acts," such as when acts "create legal consequences for a principal that are significant and separate from the transaction specifically directed by the principal." *Id.* § 2.02 cmt. h.

*Constr. Corp.*, 460 U.S. 1, 29 (1983) (approving court of appeals' resolution of a motion to compel arbitration in the first instance in the absence of "disputed issues of fact requiring a jury trial before a § 4 order could issue"). Thus, we remand to the district court for a factual finding on this issue in the first instance.

### ii.    Cotton

Batesville challenges the district court's adoption of Judge Mill's resolution of the actual authority issue.  It asserts that, at the time Cotton signed the agreement, she "possessed actual authority to act on [Roberson's] behalf, including executing the Admissions and Arbitration Agreements." As proof of Cotton's agency authority, Batesville submitted to the district court portions of Cotton's deposition, in which Cotton testified about her understanding of her authority to act for her mother, and the unsigned but notarized power of attorney.  Following the reasoning of Judge Mills's decision in *Gross*, the district court held that this evidence was insufficient as a matter of law to prove actual authority to sign a nursing-home arbitration agreement. It held that "actual authority to sign a nursing home arbitration agreement may only be established through proof of a 'formal legal device' such as a power of attorney, health-care surrogacy, conservatorship, or guardianship." As shown above, this holding was error.  The district court should not have imposed a formal-device requirement and should instead have permitted Batesville to attempt to establish the existence of an agency relationship with other types of evidence.

Like the parties in *Gross*, the parties in *Cotton* also dispute whether Cotton's deposition testimony is permissible as proof of the alleged agency

relationship. For the reasons set forth above, Cotton's sworn testimony is competent evidence on the question of Cotton's agency and its scope.

Finally, like in *Gross*, the foregoing conclusions leave open whether Batesville has in fact established (1) that Cotton had express authority to act on her mother's behalf and (2) that executing the arbitration agreement—that is, the power to relinquish legal rights[5]—was within the scope of that authority. As explained above, the existence and scope of an actual agency relationship is a question of fact. *Engle*, 223 So. 2d at 617–18. The district court below did not reach this question, and we will not decide it as a matter of law on this record. *See Pullman–Standard*, 456 U.S. at 291. Thus, we remand to the district court for a factual finding on this issue in the first instance.

**B. Estoppel**

Southaven and Batesville also argue that the district courts erred in declining to enforce the arbitration agreements on the basis of estoppel. Southaven contends that Gross represented that he was authorized to execute documents on Wagner's behalf, and that, as a result, Gross should not now be permitted to deny the arbitration agreement's enforceability. Similarly, Batesville contends that Cotton represented that she had authority to act for Roberson, and that, as a result, Cotton should now "be estopped from denying her actual authority to act as his [sic] mother's agent." These arguments overlook that Gross and Cotton brought suit not in their personal capacities, but as administrators of their mothers' estates. An administrator is a personal representative of an estate—a "person who manages the legal affairs of another because of incapacity or death." *Burley v. Douglas*, 26 So. 3d 1013, 1018 (Miss. 2009). The title "signif[ies] a representative capacity, as distinguished from an individual capacity." *Id*. The estoppel sections of both

---

[5] *See supra* note 4.

Southaven's and Batesville's briefs focus exclusively on alleged actions by Gross and Cotton in their individual capacities—namely, misrepresentations that they allegedly made to the nursing homes about their authority to sign documents for their mothers. As administrators, however, Gross and Cotton brought suit not in their individual capacities but in their capacities as personal representatives of their mothers' estates. Southaven and Batesville present no argument as to why Wagner and Roberson (and thus Wagner's estate and Roberson's estate) should be estopped from denying the enforceability of the agreements. So their estoppel arguments fail.

## IV.

Next, we address Batesville's challenges to the district court's holdings in *Cotton* as to apparent authority and ratification.

### A. Apparent Authority

Batesville argues that the district court erred in rejecting its argument that its agreement with Roberson should be enforceable because Cotton had apparent agency authority to execute the contract. To prove apparent authority under Mississippi law, a party "must put forth sufficient evidence of (1) acts or conduct of the principal indicating the agent's authority, (2) reasonable reliance upon those acts by a third party, and (3) a detrimental change in position by the third person as a result of that reliance." *Johnson*, 109 So. 3d at 565 (quoting *Reed*, 37 So. 3d at 1160). Batesville cannot satisfy this test for at least two reasons. First, in its discussion of apparent authority, Batesville focuses entirely on Cotton's conduct. It fails to articulate what act or conduct of Roberson—the alleged principal—indicated Cotton's authority to sign the arbitration agreement. Thus it does not satisfy the first prong. Second, Batesville fails to articulate how it relied on any alleged representations or detrimentally changed its position, so it does not satisfy the second or third prong, either. It contends that "[i]n reliance upon Cotton's representations of

authority to act (given in Ms. Roberson's very presence), . . . Batesville accepted Ms. Roberson as a resident, including any duties and/or liabilities potentially associated with her admission under Mississippi law." As just explained, reliance on representations by Cotton, as opposed to by Roberson, is insufficient as a matter of law to satisfy the test for apparent authority. Moreover, the Batesville arbitration agreement specifically provides that "signing of this Agreement is not a condition of admission to or residence in the Facility." So Roberson's admission could not have been a change in position for Batesville. Batesville also contends that, in the absence of the alleged representations, it "could have insisted on having Ms. Roberson execute the Arbitration Agreement, and other admissions documents." But to show detrimental reliance, a party must show that it changed position. *See Johnson*, 109 So. 3d at 565. Here, Batesville essentially argues that it did not change position—but that it might have, had it known more facts. Thus, it has not put forth evidence of detrimental reliance. Batesville's apparent authority argument fails.

## B. Ratification

Batesville also argues that the district court erred in rejecting its argument that its agreement with Roberson should be enforced on the ground that Roberson ratified it by failing to object when Cotton signed it. Mississippi law "allows a principal to ratify the agent's unauthorized acts and, upon doing so, become[] bound." *Northlake Dev. L.L.C. v. BankPlus*, 60 So. 3d 792, 796 (Miss. 2011). "Ratification does not arise by operation of law," however. *Id.* at 797. Instead, "[a] person ratifies an act by (a) manifesting assent that the act shall affect that person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." *Id.* (emphasis omitted). Although "[i]t is true that, under some circumstances, a principal's inaction can result in ratification," ratification by inaction can occur "only where the

principal has notice that others will infer from his silence that he intends to manifest his assent to the act." *Id.*

Here, Butler, the Batesville employee who went to the hospital with Roberson's paperwork, explained the circumstances surrounding Cotton's execution of the arbitration agreement as follows:

> Ms. Roberson was present in the room, just a few feet away, when Ms. Cotton executed the admission documentation and the arbitration agreement, and when her daughter represented to me that she had authority to execute these documents. At no time did Ms. Roberson object or indicate in any way that Ms. Cotton in fact was not authorized to sign these documents. I have no doubt that Ms. Roberson could hear our conversation and observe Ms. Cotton executing documents on her behalf.

Cotton testified about the circumstances as follows:

> Q. Was your mother in the room at that point?
>
> A. I think so.
>
> Q. We're talking about a standard hospital room?
>
> A. Right.
>
> Q. So your mother should have been able to hear what you were talking about?
>
> A. Yes.
>
> Q. Did she ever object or make any kind of -- or disagree in any way, I guess, with what you were telling the representative?
>
> A. No.

The district court examined this evidence and concluded that "while there is no doubt that Roberson saw [Cotton] signing documents on her behalf, there is absolutely no indication that she was aware that [Cotton] signed an agreement binding her to arbitrate." In the absence of "evidence that Roberson's inaction occurred with full knowledge of all the material facts," the district court held that it could not find ratification. We agree. There is no dispute that Roberson was in the room when the arbitration agreement was executed and that she

17

did not say anything at the time. Batesville points to no evidence, however, that Roberson knew what documents, specifically, Cotton was signing, and thus knew that an arbitration agreement was among them. Nor does it point to evidence that Roberson was on "notice that others will infer from [her] silence that [she] intends to manifest [her] assent to the act." *Northlake*, 60 So. 3d at 797. For example, there is no evidence that Butler ever asked Roberson if she was okay with Cotton signing documents for her, even though she was sitting in the same room. That Roberson "could hear" does not establish that she was, in fact, listening. As the district court correctly observed, this evidence is insufficient to prove even that Roberson was aware of what her daughter was signing for her, much less that she was on notice that her silence would constitute ratification. Hence the district court correctly rejected Batesville's ratification theory.

## V.

Finally, in *Gross*, we note "another serious obstacle," identified by Judge Mills, to Southaven's attempt to compel arbitration. The forum designated by the Southaven arbitration agreement—the National Arbitration Forum (NAF)—is no longer available. NAF's unavailability raises two questions: first, whether the Southaven arbitration agreement definitively designated NAF as the exclusive arbitration forum, and, if so, whether that designation, in light of NAF's unavailability, makes the arbitration agreement unenforceable. Both Gross and Southaven briefed these questions below, but the district court did not decide them. "Absent special circumstances, a federal appellate court will not consider an issue passed over by a district court." *Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 483 (5th Cir. 2006). Here, there is no

No. 15-60124 cons. w/ No. 15-60248

decision by the Mississippi Supreme Court on point,[6] and the federal circuits have split over both (1) the question whether an arbitration agreement worded like the one here should be interpreted as selecting an exclusive arbitration forum[7] and (2) the question whether the unavailability of a designated exclusive forum will render an arbitration agreement unenforceable.[8] Moreover, neither side briefed this issue on appeal, nor was the issue the focus of oral argument. Thus, we decline to decide it in the first instance.

## VI.

We VACATE the district courts' orders in these cases and REMAND for further proceedings.

---

[6] One Mississippi intermediate appellate court has held that NAF's unavailability renders unenforceable an arbitration agreement worded like the one here. *See GGNSC Tylertown, LLC v. Dillon ex rel. Hargrove*, 87 So. 3d 1063, 1066 (Miss. Ct. App. 2011).

[7] *Compare Galey v. World Mktg. All.*, 510 F.3d 529, 532 (5th Cir. 2007) (holding that clauses providing for arbitration "in accordance with" a particular set of rules should be interpreted as exclusive forum-selection clauses), *In re Salomon Inc. S'holders' Derivative Litig.' 91 Civ. 5500 (RRP)*, 68 F.3d 554, 558 (2d Cir. 1995) (same), *Luckie v. Smith Barney, Harris Upham & Co.*, 999 F.2d 509, 514 (11th Cir. 1993) (same), *and Roney & Co. v. Goren*, 875 F.2d 1218, 1219–21 (6th Cir. 1989) (holding similar language to be an agreement to arbitrate only before the organization whose rules were to be applied), *with Green v. U.S. Cash Advance Ill., LLC*, 724 F.3d 787, 789 (7th Cir. 2013) ("The agreement calls for use of the Forum's Code of Procedure, not for the Forum itself to conduct the proceedings. If [the provision] were designed to require arbitration to be conducted by the Forum exclusively, the reference to its Code would be surplusage; the only reason to refer to the Code is to create the possibility of arbitration outside the Forum's auspices, but using its rules of procedure.").

[8] *Compare Ranzy v. Tijerina*, 393 F. App'x 174, 176 (5th Cir. 2010) (unpublished) ("[A] federal court need not compel arbitration in a substitute forum if the designated forum becomes unavailable."), *and In re Salomon*, 68 F.3d at 561 (holding that district courts cannot "use [9 U.S.C.] § 5 to circumvent the parties' designation of an exclusive arbitral forum"), *with Green*, 724 F.3d at 792–-93 (holding that an agreement remains valid even when the forum listed in an arbitration agreement becomes unavailable), *Khan v. Dell, Inc.*, 669 F.3d 350, 356 (3d Cir. 2012) (same), *Reddam v. KPMG LLP*, 457 F.3d 1054, 1061 (9th Cir. 2006) (same), *overruled on other grounds by Atl. Nat'l Trust LLC v. Mt. Hawley Ins. Co.*, 621 F.3d 931 (9th Cir. 2010), *and Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1221–22 (11th Cir. 2000) (same).