# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01362-COA

DIVERSICARE OF MERIDIAN, LLC D/B/A          APPELLANTS
DIVERSICARE OF MERIDIAN, DIVERSICARE
LEASING COMPANY III, LLC, DIVERSICARE
MANAGEMENT SERVICES CO.,
DIVERSICARE LEASING CORP., CHRISSY
ALEXANDER, DEMETRI GORDON AND
OSHAUGNESSYZ McCORMICK

v.

LINDA DIANNE SHELTON, INDIVIDUALLY          APPELLEE
AND AS ADMINISTRATRIX OF THE ESTATE
OF SARAH ELIZABETH HAMRICK,
DECEASED, FOR AND ON BEHALF OF THE
ESTATE AND WRONGFUL DEATH
BENEFICIARIES OF SARAH ELIZABETH
HAMRICK, DECEASED

DATE OF JUDGMENT:          11/06/2020
TRIAL JUDGE:          HON. CHARLES W. WRIGHT JR.
COURT FROM WHICH APPEALED:          LAUDERDALE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANTS:          MARGARET SAMS GRATZ
ATTORNEY FOR APPELLEE:          WILLIAM C. HAMMACK
NATURE OF THE CASE:          CIVIL - CONTRACT
DISPOSITION:          AFFIRMED AND REMANDED - 02/15/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., McDONALD AND LAWRENCE, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Diversicare of Meridian LLC and other appellants[1] (collectively referred to as

---

[1] These include Diversicare Leasing Company III LLC, Diversicare Management Services Co., Diversicare Leasing Corp., Chrissy Alexander, Paula, Hazel, Demetri Gordon, Oshaughnessyz McCormick, unknown entities, and John Doe defendants.

"Diversicare") appeal the Lauderdale County Circuit Court's denial of their motion to compel arbitration in a wrongful death nursing-home case. Diversicare contends that the circuit court erred in applying Mississippi's Uniform Health-Care Decisions Act, Mississippi Code Annotated section 41-41-211(1) (Rev. 2018), when the deceased had full mental capacity and directed her daughter to sign admission papers that included an arbitration agreement, which was not required for admission. Diversicare also argues that the circuit court erroneously required a written instrument appointing the daughter to be the mother's agent. Considering the facts, relevant precedent, and the arguments of counsel, we find that the circuit court erred in requiring a written instrument to establish the daughter's agency but correctly held that the arbitration agreement was unenforceable, albeit for different reasons. Accordingly, we affirm and remand for further proceedings.

**Facts**

¶2.	Eighty-one-year-old Sarah Elizabeth Hamrick was admitted to Anderson Regional Medical Center for treatment of injuries resulting from a fall. She was discharged to Diversicare for rehabilitative care on August 12, 2019.

¶3.	Hamrick's daughter, Linda Diane Shelton, accompanied Hamrick when she was admitted to Diversicare on August 13, 2019. According to an affidavit Shelton submitted, Hamrick was in a wheelchair, very uncomfortable, and nauseated at the time. Hamrick was not in a condition to complete or understand the documents given to her, which already had been filled out. She repeatedly voiced a desire to get to a bed, and her daughter opined that Hamrick needed to resume the oxygen treatment she had been on at the hospital. Hamrick

2

told Diversicare's representative, Chrissy Alexander, that Shelton "could sign the documents" for her, and Hamrick was present when Shelton did. Shelton had no power of attorney, conservatorship, or guardianship order, nor did she have a written healthcare proxy authorizing her to make healthcare decisions for Hamrick. No physician had determined that Hamrick lacked the mental capacity either to sign the paperwork herself or to authorize her daughter to sign on her behalf. The parties agree that Hamrick was mentally competent. In her affidavit, Shelton further said that Diversicare's representative had the paperwork prepared and indicated to Shelton where signatures were needed. Shelton signed all the documents with her name, "Diane Shelton," not Hamrick's name, and with no language indicating she was Hamrick's legal representative. Diversicare did not contest any of the facts in Shelton's affidavit.

¶4.    Among the documents Shelton signed was a "Resident Admission/Change Form," which included addresses and phone numbers of the resident and a secondary contact. The form lists Shelton as Hamrick's "Primary Contact & Financially Responsible Party." The form also contains three specific questions about Shelton's status:

> The Primary Contact is the Resident Legal Representative as define on the reverse of this form: ___ Yes    ___No.

> The Primary Contact is the Financially responsible Party as defined on the reverse of this form: ___Yes    ___No.

> The Primary Contact is responsible for the Health Care Decisions as defined on the reverse of this form: ___Yes ___No.

No blanks were checked.

¶5.    Shelton also signed a ten-page "Admission Agreement," which contained eleven

3

distinct sections. The Preamble to the agreement gives instructions about signing:

> If you are able to do so, you must sign this Agreement in order to be admitted to this Center. If you are not able to sign this Agreement, your Legal Representative, who has been given authority by you *to admit* you to the Center, must sign it on your behalf. This Agreement will become effective on the day you are admitted to the Center regardless of the date you and/or your Legal Representative signs it. *You are not required to sign any other document as a condition of admission to the Center*.

(Emphasis added). The "parties to the agreement" were identified as "Diversicare of Mdn" and "Sarah Hamrick." At the end of the agreement, there was a signature line for the resident, which was left blank. Below that line was another one, which Shelton signed and which read, "by my signature, I represent that I am a person duly authorized by Resident by law to execute this Admission Agreement and that I accept its terms." Shelton signed "Diane Shelton (daughter)." Thereafter, the form notes that the facility required the submission of "all documents verifying the status of the Legal Representative" at the time of admission. Such documents included "power of attorney, durable power of attorney, healthcare proxy, guardianship appointment, conservator appointment." Shelton had no such documents; she had only verbal authorization by Hamrick to "sign the documents" for her.

¶6.     Among the documents presented in the Appendix to the Admissions Agreement was a four-page arbitration agreement purportedly entered into between "Diversicare of Mdn" and "Sarah Hamack."[2] It was titled "Alternative Dispute Resolution Agreement" and specifically said, "This agreement is not a condition of admission to or continued residence in the center." The document also informed the signor that he or she could revoke the

---

[2] Hamrick's name was misspelled in this document.

4

agreement by sending written notice to the nursing home within thirty days.

¶7.     Shelton later claimed that she did not have authority to sign the arbitration agreement. In her affidavit, she said that she thought all the paperwork was required for admission and that the agreement and its potential effects were not explained to her; they were in a rush to get Hamrick into a room, so she did not have an opportunity to read all the documents. Although Shelton says she asked for copies of the paperwork to be able to review them and was told copies would be brought to the room, none were ever provided to her until after Hamrick's death.

¶8.     Hamrick died two days later on August 15, 2019, while in Diversicare's facility. Shelton retained an attorney in October 2019, and on March 2, 2020, Shelton was appointed as the administratrix of Hamrick's estate.  On March 16, 2020, her attorney sent a pre-suit notice of the family's claim for Hamrick's wrongful death to the Diversicare entities and other individuals she claimed were responsible.  The notice included a copy of an August 29, 2019 investigative report prepared by the Mississippi Department of Human Services Center for Medicare and Medicaid Services, which noted deficiencies in the care rendered to Hamrick.

¶9.     On June 2, 2020, Shelton individually and on behalf of the estate and other wrongful death beneficiaries of Hamrick,  filed a wrongful death lawsuit in Lauderdale County Circuit Court.  The defendants included Diversicare of Meridian LLC and related Diversicare legal entities,[3] Chrissy Alexander, Paula Hazel, Demetri Gordon, Oshaughnessyz McCormick,

---

[3] These include Diversicare Leasing Company III LLC, Diversicare Management Services Co., and Diversicare Leasing Corp.

unknown entities, and John Doe defendants. In her complaint, Shelton alleged that "when [she] present[ed] for admission, the Decedent was unable to comprehend and sign the documents the Diversicare Defendants required for a person to be admitted to the Facility." Shelton further alleged Diversicare's employees breached the standard of care owed to Hamrick by, inter alia, failing to maintain Hamrick's oxygen levels, failing to call a "full code" and administer CPR, and delaying to call emergency responders—proximately causing Hamrick's death.

¶10. On July 10, 2020, Diversicare filed a motion to dismiss the proceeding and to compel arbitration. Diversicare argued that Hamrick, who was mentally competent, gave Shelton express authority to sign the admission paperwork, including the arbitration agreement. Diversicare attached several documents, including the arbitration agreement, but Diversicare filed no affidavit to provide any additional facts of the events on that day that might have differed or supplemented the facts contained in Shelton's affidavit.

¶11. Shelton opposed the motion to dismiss and compel, arguing that she lacked the legal authority to sign for Hamrick under the Uniform Health-Care Decisions Act, Mississippi Code Annotated sections 41-41-201 to -229 (Rev. 2018). Additionally, Shelton argued that Diversicare had waived or was estopped from enforcing the agreement and that the arbitration agreement was procedurally unconscionable.

¶12. On September 1, 2020, the circuit court heard argument on Diversicare's motion, and on September 3, 2020, the court issued an order denying the motion to dismiss and compel arbitration. The circuit court reasoned that the arbitration agreement was not signed by

6

Hamrick but instead by a person acting as her surrogate. Under Mississippi Code Annotated section 41-41-211(1), a surrogate may make a health-care decision for a patient only if that patient's primary physician has determined that the patient lacks capacity and no agent or guardian has been appointed. The circuit court said there was no evidence of a determination of Hamrick's incapacity by her primary physician, and there was no instrument appointing Shelton to act as her agent. Moreover, the circuit court found that Shelton had no written authority to sign on Hamrick's behalf, as is required in Diversicare's own contract documents. Accordingly, the circuit court denied the motion to compel arbitration, finding that Shelton "lacked the legal capacity to enter into the agreement and did not have the authority to sign the admissions agreement" on Hamrick's behalf.

¶13. On September 14, 2020, Diversicare filed a motion to alter or amend the circuit court's judgment. Diversicare pointed out that there was no Mississippi precedent on whether a formal legal document is required to confer actual agency authority to sign an arbitration agreement for another person. Diversicare argued that Shelton was orally granted actual authority to enter the arbitration agreement, which Diversicare argued is sufficient. After Shelton responded to Diversicare's Mississippi Rule of Civil Procedure 59 motion, the circuit court heard arguments on November 6, 2020. That same day, the court held that its prior ruling was correct, readopted it, and denied Diversicare's motion.

¶14. Diversicare appealed the circuit court's rulings and argues in its brief (1) that the healthcare surrogate statute, Mississippi Code Annotated section 41-41-211 does not apply in this case and (2) that Mississippi Code Annotated section 41-41-205 and common law

7

precedent authorizes a mentally competent nursing-home resident to orally grant authority to another to sign an arbitration agreement.[4]

## Standard of Review

¶15. Appellate courts apply a de novo standard of review to a trial court's decision to grant or deny a motion to compel arbitration. *Hillhouse v. Chris Cook Constr. LLC*, 325 So. 3d 646, 649 (¶5) (Miss. 2021) (citing *Covenant Health & Rehab. of Picayune LP v. Est. of Moulds ex rel. Braddock*, 14 So. 3d 695, 701 (¶18) (Miss. 2009)). The interpretation of a statute is a question of law for which the standard of review on appeal is also de novo. *Id*. (citing *Dancy v. State*, 287 So. 3d 931, 935-36 (¶14) (Miss. 2020) (quoting *Rex Distrib. Co. v. Anheuser-Busch LLC*, 271 So. 3d 445, 449 (¶13) (Miss. 2019))). "This Court may affirm a circuit court if the correct result is reached, even if the circuit court reached the correct result for the wrong reasons." *White v. Cmty. Bancshares of Miss. Inc.*, 310 So. 3d 842, 848 (¶16) (Miss. Ct. App. 2021); *Methodist Hosp. of Hattiesburg Inc. v. Richardson*, 909 So. 2d 1066, 1070 (¶7) (Miss. 2005).

## Discussion

¶16. The Federal Arbitration Act, 9 U.S.C. § 1 et seq., applies in the examination of nursing-home admissions agreements that contain arbitration agreements. *Adams Cmty. Care Ctr. LLC v. Reed*, 37 So. 3d 1155, 1158 (¶6) (Miss. 2010). "In determining the validity of a motion to compel arbitration under the Federal Arbitration Act, courts generally conduct a two-pronged inquiry." *Virgil v. Sw. Miss. Elec. Power Ass'n*, 296 So. 3d 53, 59 (¶13)

---

[4] Diversicare later abandoned its argument on the applicability of section 41-41-205. *See infra* ¶22.

(Miss. 2020) (quoting *E. Ford Inc. v. Taylor*, 826 So. 2d 709, 713 (¶9) (Miss. 2002)). "The first prong has two considerations: (1) whether there is a valid arbitration agreement and (2) whether the parties' dispute is within the scope of the arbitration agreement." *Id*. The issue in this case is the validity of the agreement to arbitrate.

¶17. To determine whether there is a valid arbitration agreement, we apply the legal principles of contract law. *Trinity Mission Health & Rehab of Holly Springs LLC v. Lawrence*, 19 So. 3d 647, 649 (¶5) (Miss. 2009) ("To conclude that there was an agreement to arbitrate, there must be a valid contract."). The elements of a contract are "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *Est. of Humphrey ex rel. Humphrey v. Tunica Cnty. Health & Rehab LLC*, 329 So. 3d 563, 567 (¶14) (Miss. Ct. App. 2021); *Tarvin v. CLC of Jackson LLC*, 193 So. 3d 633, 637 (¶11) (Miss. 2016); *Adams Cmty. Care Ctr. LLC*, 37 So. 3d at 1158 (¶7). At issue in this case is whether Shelton had the legal authority to enter into the arbitration agreement on Hamrick's behalf.

¶18. The Mississippi Supreme Court has held that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Wellness Inc. v. Pearl River Cnty. Hosp.*, 178 So. 3d 1287, 1292 (¶14) (Miss. 2015) (quoting *Trinity Mission Health & Rehab. of Holly Springs*, 19 So. 3d at 651 (¶14)). "The burden of establishing the existence of an arbitration agreement, in line with the burden of establishing the existence of a contract, rests on the party seeking to invoke it." *Id*. As the proponent of the arbitration agreement

9

in this case, Diversicare has the burden of establishing that Shelton had the authority to sign the arbitration agreement on Hamrick's behalf.

¶19.	Other than noting that the arbitration agreement was not signed by Hamrick but by another person on her behalf (a surrogate), the circuit court made no specific findings of fact in the order denying Diversicare's motion to dismiss and compel.  However, because Diversicare did not dispute the facts contained in Shelton's affidavit, we conclude that the circuit court decided the questions of law presented to it by relying on those undisputed facts and we consider these in our evaluation of the court's ruling.  *See Indem. Ins. Co. of N. Am. v. Guidant Mut. Ins. Co.*, 99 So. 3d 142, 156 (¶37) (Miss. 2012).

I.	**Whether the circuit court erred in applying Mississippi Code Annotated section 41-41-211.**

¶20.	In denying Diversicare's motion to dismiss and compel, the circuit court first ruled that Shelton had no statutory authority to sign the arbitration agreement on Hamrick's behalf because she was not a health-care surrogate under Mississippi Code Annotated section 41-41-211(1).  This Code section provides a method for an individual to be authorized to make health-care decisions for a person who has been certified by his family physician as incapacitated.  The statute specifically states:

> A surrogate may make a health-care decision for a patient who is an adult or emancipated minor if the patient has been determined by the primary physician to lack capacity and no agent or guardian has been appointed or the agent or guardian is not reasonably available.

Miss. Code Ann. § 41-41-211(1).  The circuit court held that because Hamrick was never determined by her personal physician to lack the mental capacity to sign the admission

documents, which included the arbitration agreement, Shelton had no authority under section 41-41-211(1) to do so. There is ample precedent for strictly applying the statute and requiring that a resident's primary physician certify incompetence and if a family member must sign documents. *See Tarvin*, 193 So. 3d at 638 (¶20); *Adams Cmty. Care Ctr. LLC*, 37 So. 3d at 1159 (¶10); *Miss. Care Ctr. v. Hinyub*, 975 So. 2d 211, 217 (¶15) (Miss. 2008).

¶21. Although Shelton stated in her affidavit that "at the time of admission, Ms. Hamrick was not in a condition to complete or understand the documents," Shelton agrees that Hamrick was mentally competent at all times. But in *Grenada Living Ctr. LLC v. Coleman*, 961 So. 2d 33, 37 (¶13) (Miss. 2007), the Mississippi Supreme Court said that section 41-41-211(1) does not apply in such cases. In that case, the parties stipulated that the resident, Coleman, was competent at the time of his admission. *Id*. at 36 (¶4). No physician had declared him to be incompetent. *Id*. at 37 (¶13). The supreme court held that the half-sister who signed the admission papers, including an arbitration agreement, could not have done so as his health-care surrogate, explaining:

> [I]t is clear from the statute that the Legislature intended to create a system whereby a family member (or other de facto guardian) could tend to the health needs of a loved one when they were incapacitated. Because Mr. Coleman was not incapacitated, the statutes governing health care surrogates do not apply.

*Id*. Similarly, in this case, because there is no dispute that Hamrick was competent, we find that the circuit court erred in its application of section 41-41-211 to these facts. However, there are other means by which Shelton could have been authorized to sign documents for Hamrick.

11

¶22. Initially, Diversicare had raised another provision of the Uniform Health-Care Decisions Act that allows for an oral designation of a health-care surrogate when a patient or resident is competent. This section reads:

> (1) An adult or emancipated minor may give an individual instruction. The instruction may be oral or written. The instruction may be limited to take effect only if a specified condition arises.

Miss. Code Ann. § 41-41-205(1). Although Diversicare argued in its brief that Shelton was authorized to agree to the arbitration agreement under this section, Diversicare abandoned this position during oral argument. This Court specifically asked Diversicare whether either sections 41-41-211 or 41-41-205 applied to this case. Diversicare responded that the Act "did not apply at all." Diversicare said that when Hamrick allowed Shelton to sign her name to the admissions papers, Hamrick was not appointing Shelton to be her healthcare surrogate, and at all times Hamrick retained the authority to make her own healthcare decisions. An appellate court need not rule on an issue abandoned by a party on appeal. *Summers v. Gros*, 319 So. 3d 479, 485 (¶21) (Miss. 2021) (quoting *Arrington v. State*, 267 So. 3d 753, 756 (¶8) (Miss. 2019) ("The law is well established that points not argued in the brief on appeal are abandoned and waived.")). A party can explicitly abandon an issue during oral argument. *Holder v. City of Vancouver*, 147 P.3d 641, 643 (¶5) (Wa. Ct. App. 2006); *see also Allen v. Ambu-Stat LLC*, 799 F. App'x 703, 710 (11th Cir. 2020) ("An argument can be abandoned at oral argument."). Thus, because Diversicare abandoned its argument that Shelton was authorized to sign the arbitration agreement under section 41-41-205(1), we make no decision about her authority on that basis.

## II. Whether Shelton had authority to sign the arbitration agreement under the principles of contract and agency law.

¶23. As its second basis for refusing to enforce Diversicare's arbitration agreement, the circuit court held that there was no written instrument appointing Shelton to act as Hamrick's agent. Diversicare contends that when Hamrick orally authorized Shelton to sign documents for her, Hamrick appointed her as Hamrick's agent under general principles of contract and agency common law to sign not only the admissions agreement, but also the arbitration agreement.

¶24. "The burden of proving an agency relationship rests squarely upon the party asserting it." *Forest Hill Nursing Ctr. Inc. v. McFarlan*, 995 So. 2d 775, 781 (¶13) (Miss. Ct. App. 2008) (citing *Highlands Ins. Co. v. McLaughlin*, 387 So. 2d 118, 120 (Miss. 1980)). There is no formality required for the creation of an agency relationship. Jeffrey Jackson, Mary Miller & Donald Campbell, *Encyclopedia of Mississippi Law*, § 4.4 (updated Oct. 2021). "An express agency is generally based on an *oral or written* agreement between between the principal and the agent." *Id.* (emphasis added). "Actual authority, also termed express or direct authority, is the authority actually conferred by the principal." *Newsome v. Peoples Bancshares*, 269 So. 3d 19, 28 (¶24) (Miss. 2018). "An express agent is one who is 'in fact authorized by the principal to act on their behalf.'" *Forest Hill Nursing Ctr. Inc.*, 995 So. 2d at 781 (¶13) (citing *McFarland v. Entergy Miss. Inc.*, 919 So. 2d 894, 902 (¶25) (Miss. 2005)). Another form of agency authority is implied authority, which is the "authority that the principal has by words or conduct held the alleged agent out as having." *Miss. Bar v. Thompson*, 5 So. 3d 330, 336 (¶26) (Miss. 2008). A third type of authority, apparent

13

authority, "exists when a reasonably prudent person, having knowledge of the nature and the usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to have." *Cent. Indus. Inc. v. McFarlane*, 159 So. 3d 610, 614 (¶7) (Miss. Ct. App. 2015). However, in establishing apparent authority, one must first prove the acts or conduct on the part of the principal that indicate the extent of the agent's authority. *Id*. Thus, to establish any type of agency authority, a claimant must present sufficient evidence of words, acts, or conduct of the principal to conclude that the agent had the authority to perform a specific act. *Adams Cmty. Care Ctr. LLC*, 37 So. 3d at 1160 (¶14).

¶25. Applying these principles to the facts in the case, it is clear that Hamrick, who the parties agree was competent, orally informed the Diversicare representative that Shelton could sign documents for her. Thus, by her words, she clearly granted Shelton express authority to act on her behalf to a certain extent. Accordingly, we hold that Hamrick could and did orally appoint Shelton as her agent to sign documents for her and that no written instrument was required.

¶26. We recognize that heretofore there has been no decision by our appellate courts determining whether a mentally competent individual can orally grant another person to be his agent for signing documents for admission to a nursing home. However, the Fifth Circuit Court of Appeals made an "*Erie* guess" in *Gross v. GGNSC Southaven L.L.C.*, 817 F.3d 169 (5th Cir. 2016), that we would not require a formal written instrument in such cases. In *Gross*, a son (Gross) had signed nursing-home admission papers for his mother (Wagner),

14

which included an arbitration agreement. *Id*. at 174. Wagner had orally authorized Gross to manage certain of her affairs but she never signed a power of attorney. *Id*. The federal district court had held that orally conveying authority was insufficient to bind a resident to an arbitration agreement and that written authorization was required. *Id*. at 175. The Fifth Circuit disagreed to the extent that written authorization of agency was required. After reviewing Mississippi contract and agency legal precedents, the court made an "*Erie* guess"[5] and held that "it is clear that the authority to enter a contract may be conveyed orally and that no formal writing is required as a general rule of Mississippi law." *Id*. at 177. However, the court found that "the existence and scope of an actual agency relationship is a question of fact, which the district court below did not reach." *Id*. at 180 (quoting *Engle Acoustic & Tile Inc. v. Grenfell*, 223 So. 2d 613, 617-18 (Miss. 1969)). Because the court could not decide the agency issue as a matter of law with the record before it, the court remanded the case for further proceedings. *Id*.

¶27. In the case before us, considering the testimony presented in Shelton's affidavit and the documents in the record, we find that Hamrick did orally appoint Shelton to be her agent. The next question, however, is whether Diversicare provided sufficient evidence to prove that the scope of Shelton's authority included the authority to sign the arbitration agreement.

¶28. Diversicare argues that because Hamrick did not specifically limit Shelton to signing *only* documents *required* for admission to the facility, Hamrick authorized Shelton to sign

___

[5] Under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938), when applying undecided state law, the federal court may look to decisions of that state's supreme court in analogous cases to "guess" how that state's supreme court may rule on an issue.

all documents, including the arbitration agreement. Shelton disagrees. The *Gross* decision addressed this issue as well:

> [An] agent's testimony is competent evidence of actual authority because the agent will usually be the best positioned to testify about his belief at the time he acted. Moreover, the Mississippi Supreme Court has stated in dicta that "[i]n Mississippi, agency and the scope thereof may be proved through the testimony of the agent alone." *Eaton v. Porter*, 645 So. 2d 1323, 1326 (Miss.1994). Thus, Gross's sworn testimony is competent evidence on the question of Gross's agency and its scope.

*Gross*, 817 F.3d at 179-80. The record before us does not contain the specific words Hamrick used; Shelton's affidavit only says that Hamrick told Diversicare's representative that Shelton could "sign the documents" for her. However, Shelton said in her uncontested affidavit that they were taken to an office "to complete the admission process" and that she believed "all documents [which the nursing home had already filled out that] she signed were requirements for admission." Thus, Shelton argues, she only was given authority to sign documents required for admission, which would not include the arbitration agreement. Diversicare provided no affidavit to counter Shelton's and no other proof to support an expansive interpretation of Hamrick's statement.

¶29. Although there is no Mississippi case directly on point, other courts' rulings on similar facts applying similar agency common-law principles show how fact-dependent the creation and scope of an agent's authority are. For example, a Northern District of Mississippi federal district court later applied *Gross* to facts before it and determined that a son, whose mother was competent and who authorized her son to sign documents for her admission because her hands shook, was authorized to sign an arbitration agreement. *Crowe v. GGNSC Ripley LLC*,

16

318 F. Supp. 3d 970, 982 (N.D. Miss. 2018). But the facts in that case are distinguishable from the ones here. In that case, there was evidence that family members had customarily signed documents for their mother because of her condition. *Id*. at 980. They said they did nothing behind their mother's back, *id*., and in fact, several of the documents were specifically discussed with the mother, such as the authorization for the flu vaccination. *Id*. at 978. The record clearly painted a picture of an admission process where documents were presented, several of which were discussed with the mother, and then signed by the son as he would customarily do after consultation with his mother. *Id*. at 980-81. The federal district court, sitting as the trier of fact, found sufficient evidence to support its finding that the son's authority to sign documents included authorization to sign the arbitration agreement. *Id*. at 981.

¶30. The facts before us paint a completely different picture—one of an elderly patient having difficulty breathing who wanted to get to her room as soon as possible after admission, and whose daughter signed paperwork for this to happen. There was no proof that Shelton had customarily signed for her mother in the past. Nor was there any proof that any of the individual documents were discussed with Hamrick. *Crowe* is merely instructive on the proof that needs to be in a record for a trial court to conclude that the burden of proof of the scope of the agent's authority to sign an arbitration agreement had been met.

¶31. Clearly the facts in this case are distinguishable from those in *Crowe*. Here we have no testimony or affidavit from Diversicare's admissions representative Chrissy Alexander to dispute or supplement the facts presented by Shelton. Shelton never said she was

17

assuming responsibility for Hamrick's care in the future; she had no power of attorney at the time of signing the documents, nor did Hamrick ever execute one later. Shelton said she was rushed through the signing of the documents; she was not explained anything about the arbitration agreement and did not receive a copy to review it until after her mother's death.

¶32. A ruling on facts more similar to those before us is found in *Kindred Healthcare Inc. v. Henson*, 481 S.W.3d 825 (Ky. Ct. App. 2014). There the Kentucky Court of Appeals held that a mother, who was "too nervous and shaky" to sign a nursing home's admissions papers and had asked her son to sign them, did not authorize him to bind her to an arbitration agreement. *Id*. at 827. In arriving at its decision, the court pointed to testimony of the son who said that he had been rushed through the admissions process, that he had been urged not to read any of the documents, and that none of the documents were explained to him; instead they were merely placed in front of him for signing. *Id*. at 828. The nursing home presented testimony from its representative, who did not recall the admission specifically but testified as to her routine. *Id*. She said she would never direct someone to sign the paperwork without reading it because that was rude and bad business. *Id*. The Kentucky Court of Appeals upheld the trial court's denial of the nursing home's motion to compel arbitration, explaining, inter alia, that when the mother said, "Rick, take care of it for me," the reasonable assumption was that she wanted Rick to handle her admission to the nursing home and that she did not contemplate the sacrifice of judicial dispute resolution. *Id*. at 829-30. Regarding whether the son had actual, implied, or apparent authority, the appellate court said that when the mother gave her son the directive, it was clearly related to signing the admission

documents because nothing further had been mentioned at that time. *Id.* at 830. The arbitration agreement also was not necessary for Ferguson's admission. *Id.* It was undisputed that these were the mother's only words, and the Kentucky court felt this was not sufficient to create an apparent agency. *Id.*

¶33.   As in *Kindred Healthcare*, the undisputed facts in this case show that although competent, Hamrick was ill enough not to feel able to sign the admissions documents. She was taken from the hospital, where she had been on oxygen, to the nursing home in wheelchair,  and she and her daughter were presented papers necessary to be signed for her admission to the facility.  Hamrick authorized Shelton to "sign the documents" needed for that purpose.  Although the arbitration agreement was not required for admission, it was one of numerous documents Shelton signed believing all were required for her mother to be admitted.  The arbitration agreement was not discussed with her or Hamrick.  Because Diversicare presented no testimony or other proof to support a finding that the scope of Shelton's authority included signing anything more than documents required for Hamrick's admission, we affirm the circuit court's holding that Shelton had no authority to sign the arbitration agreement.[6]

¶34.   Because we find that Diversicare failed to prove that Shelton, as Hamrick's limited agent to sign paperwork required for her mother's admission, also had the authority to sign the arbitration agreement, we need not discuss Shelton's arguments of its unenforceability

---

[6] Because we hold Shelton had no authority to sign the arbitration agreement in the first place, she had no authority to revoke it either, making the agreement's thirty-day revocation clause irrelevant.

on procedural-unconscionability grounds.

## Conclusion

¶35.   We hold that a mentally competent individual may orally grant authority to another person to sign documents required for admission to a nursing home.  To that extent, the circuit court erred by holding that a written instrument was required.  Whether the extent of the authority orally conferred includes the signing of an arbitration agreement depends on the proof provided by the nursing home of the words, conduct, and events surrounding the execution of the documents.  In this case, Diversicare failed to provide sufficient proof that Hamrick gave Shelton the authority to bind her to arbitrate any future disputes that may arise concerning her stay.  Because Diversicare did not prove Shelton had authority to sign the arbitration agreement, we affirm the circuit court's denial of Diversicare's motion to compel arbitration and remand for further proceedings consistent with this opinion.

¶36.   **AFFIRMED AND REMANDED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. BARNES, C.J., NOT PARTICIPATING.**